604 A.2d 960

IN THE MATTER OF THE PETITION OF UNITED PARCEL SER-
VICE, INC. REQUESTING AN EXEMPTION FROM CASINO
SERVICE INDUSTRY LICENSURE REQUIREMENTS UNDER
N.J.S.A. 5:12–92(c).

IN THE MATTER OF THE MOTION OF UNITED
PARCEL SERVICE, INC. FOR REHEARING
PURSUANT TO N.J.S.A. 5:12–107(d)(1).

Superior Court of New Jersey
Appellate Division

Argued February 4, 1992—Decided March 16, 1992.

Before Judges MICHELS, O'BRIEN and HAVEY.

*Susanne Peticolas* argued the cause for appellant United Parcel Service, Inc. (*Crummy, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Susanne Peticolas,* of counsel and on the brief).

*E. Dennis Kell,* Senior Assistant Counsel, argued the cause for respondent New Jersey Casino Control Commission (*Daniel Carluccio,* General Counsel, attorney; *Seth H. Briliant,* Assistant Counsel, of counsel and on the letter brief).

*Charles F. Kimmel,* Deputy Attorney General, argued the cause for respondent Division of Gaming Enforcement, Department of Law and Public Safety, State of New Jersey (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney, submitted a statement in lieu of brief; *Gary A. Ehrlich,* Deputy Attorney General, of counsel and on the statement).

The opinion of the court was delivered by

MICHELS, P.J.A.D.

Petitioner United Parcel Service, Inc. (UPS), a privately owned company, appeals from a final administrative action of respondent New Jersey Casino Control Commission (Commission) that denied its petition for an exemption from the casino service industry licensure requirements pursuant to *N.J.S.A.* 5:12–92(c) and from an order that denied its motion for rehearing pursuant to *N.J.S.A.* 5:12–107(d)(1). *N.J.S.A.* 5:12–92(c) authorizes the Commission to grant exemptions from the casino service industry licensure requirements when an entity proposing to do business with a casino demonstrates that it is regulated by a "public agency." The Commission found that UPS's regulation by the Interstate Commerce Commission was not a sufficient substitute for regulation under the Casino Control Act (Act). We affirm the Commission's decision denying UPS an exemption from the licensure requirements.

Briefly, the procedural history giving rise to this appeal is that on August 8, 1990, pursuant to *N.J.S.A.* 5:12–92(c), UPS filed a request for an exemption from the casino service indus-

try (CSI) licensure requirements. UPS contended that it was a common carrier engaged in interstate operations and, as such, was subject to regulation by the Interstate Commerce Commission (ICC), under the Interstate Commerce Act (ICA), 49 *U.S.C.A.* § 10101 *et seq.* (Supp.1991). Further, UPS maintained that the ICC regulation constituted a "sufficient substitute" for the regulatory scheme of the Act. Specifically, it noted that the ICC required that UPS rates be established by tariff, reviewed the tariffs to ensure that the rates charged were reasonable, and prohibited UPS from engaging in discriminatory pricing practices such as providing rebates or drawbacks. Additionally, UPS noted that ICC regulations also require a common carrier to demonstrate financial capability in order to receive an ICC certificate. UPS explained that granting an exemption to it would not be adverse to the public interest because the economic relationship between UPS and casino hotel operators was not so close as to afford either UPS or the gaming operator the opportunity to exert improper influence over the business decisions of the other. UPS also emphasized that the services provided by it were not directly related to actual gaming operations, and that UPS personnel were not a constant physical presence at casinos and, indeed, were required to pick-up and deliver goods promptly. Finally, UPS maintained that the local interests advanced by requiring regulation under the Act were insufficient to justify the excessive burden imposed on interstate commerce, and that requiring it to comply with CSI licensure requirements would violate the Commerce Clause of the U.S. Constitution.

On September 12, 1990, a Deputy Attorney General (Deputy) representing the Division of Gaming Enforcement (Division) advised the Commission that the Division did not object to the requested exemption. The Deputy noted that although, unlike the Act, the ICC did not provide for disqualification of enterprises, employees or agents due to criminal convictions, "the existence of established tariffs, coupled with a competitive marketplace, should preclude the possibility of undue influence,

economic or otherwise, over casino licensee customers and protect the public interest so as to satisfy the policies of the Casino Control Act."

On September 26, 1990, the Commission held a hearing on UPS's petition. At the hearing, a Deputy from the Division expressed the view that there was no necessity for regulation under the Act, although he also acknowledged that the ICC did not perform the "good character, honesty and integrity" reviews of potential licensees which are a part of the Act. The Deputy considered that the ICC rate-setting process, coupled with competition with UPS, "will ensure a character and integrity standard because of the fact that simply nobody could exert an undue influence."

Commissioner Waters declined to support a motion in favor of granting the exemption and commented that:

COMMISSIONER WATERS: I can't support the motion. I think it's pretty clear that one of our primary concerns has to do with the way in which another agency regulates an entity to see that it's similar to that which we look for in the State of New Jersey. One of the prime factors I always thought was good character, honesty and integrity issues that needed to be examined by the Division to make sure that no one unsavory in any way received any economic benefit from the industry, not the fact that just might have a transitory relationship and might just be delivering packages and moving on. I don't think the question related to the drivers and their ability to satisfy any character requirements. That's never been the issue as far as I know. I think heretofore and in the case of Sprint and MCI we came to the conclusion that we were granting the exemption because the system of regulation as carried out by the Board of Public Utilities was virtually equivalent to the CSI licensing requirements of the Act. I know the argument has been made by UPS that this constitutes a burden on interstate commerce. I think that has been dealt with over the years dating back to 1970 that the state if it has a legitimate local interest can end up with requirements that suit that interest and as has been indicated by Federal Express, they are licensed, hasn't constituted any undue burden from that standpoint.

So I think for those reasons I don't quite agree that every one of these things has to be looked at individually if they are in the same industry that there should be a common thread that we can look to to determine licensing, and I think, Madam Chair, you have raised the issue about garbage haulers. If they are engaged in interstate activities, are licensed by the ICC, and I think we all are aware of some of the unsavory people involved in that activity over the years and may still be there. For that reason I would exempt [sic] from licensure anyone of this type. I would certainly want to know what their good

character, honesty and integrity was and whether it would meet the requirements of our Act.

The majority of the Commission endorsed Commissioner Waters' reasoning, and a motion denying the exemption was passed three-to-two. On October 5, 1990, an order denying the exemption and directing UPS to submit a CSI license application before October 26, 1990, was entered. Additionally, UPS also filed a notice of motion for a rehearing on its petition for an exemption from the CSI licensure requirements on the same day.

In support of its motion for rehearing, UPS argued that the Commission had improperly denied the exemption because it had mistakenly believed that approving the UPS request would set a precedent for exempting solid waste collectors, who were also regulated by the ICC. UPS also maintained that the policy issues underlying *N.J.S.A.* 5:12–92(c) had not been fully addressed, and that the Commission failed to accord due deference to the Division's recommendation to grant the exemption.

On October 26, 1990, the Commission held a hearing on UPS's motion for reconsideration at which time UPS emphasized that the primary basis for seeking a rehearing was that the Commission had been split on whether each exemption petition should be considered on an individual basis, or whether that approach was not practicable. UPS emphasized that the statute itself required a case-by-case analysis. Commissioner Armstrong volunteered that her comment about garbage haulers was not material to her earlier vote to deny the exemption. She explained that she had referred to the industry only because the argument about UPS's employees having minimal contact with casino employees did not seem to her to be a basis for granting the exemption and had intended to point out that garbage haulers also had only minimal contact with casino employees, yet no one questioned that garbage haulers had a long-standing "unsavory" reputation and thus needed to comply with CSI licensure requirements.

At the close of argument, Chairman Perskie, appointed during the period between the first and second hearings, expressed his view that he would have voted for the exemption if he had been a member of the Commission at the time of the initial hearing. However, he believed it was inappropriate to re-visit a decision made before his tenure and concluded that the principle of *stare decisis* should control. He reasoned that the earlier decision was not grounded in any confusion, any consideration of inappropriate circumstances, or any failure to consider facts that should have been considered. The Commission voted unanimously to deny the motion for reconsideration, and on November 2, 1990, the Commission entered an order formalizing that decision which directed UPS to file a CSI application on or before November 30, 1990.

On November 15, 1990, UPS filed a notice of appeal from the Commission's October 5 and November 2, 1990, decisions and a notice of motion requesting a stay of the Commission's order pending the resolution of the appeal. On November 26, 1990, the Division indicated that it "had no objection to the grant of a casino service industry license exemption to UPS, [and therefore took] no position on UPS's petition for a stay." On November 29, 1990, the Commission denied the stay and directed UPS to file a completed CSI license by the earlier of December 5, 1990, or the date on which UPS was able to appear before the Appellate Division for emergent relief. On December 4, 1990, we granted UPS's emergent application for a stay of the November 2 order pending the outcome of this appeal.

UPS contends generally on this appeal that the Commission's interpretation of *N.J.S.A.* 5:12–92(c) is unreasonable as "the standard applied by the Commission is neither explicitly expressed nor implied in the language of the statute." Further, UPS argues that "the Commission's argument that regulation by a public agency is equivalent to regulation by an agency with a statutory scheme sufficiently similar ... to [the] Division of Gaming Enforcement oversight deprives the second prong of the test [in *N.J.S.A.* 5:12–92(c)] of any meaning."

Pursuant to the 1976 amendment to the *N.J. Const. of 1947* art. IV, § 7, para. 2, the New Jersey Legislature enacted the Casino Control Act, *N.J.S.A.* 5:12–1 *et seq.*, "to authorize casino gaming and establish the regulatory framework for the casino industry." *Knight v. Margate*, 86 *N.J.* 374, 380, 431 *A.*2d 833 (1981); *see* Honorable R. Benjamin Cohen, *The New Jersey Casino Control Act: Creation of a Regulatory System*, 6 *Seton Hall Legis.J.* 1, 2 (Summer 1982); Thomas R. O'Brien and Mary Jo Flaherty, *Regulation of the Atlantic City Casino Industry and Attempts to Control Its Infiltration by Organized Crime*, 16 *Rutgers L.J.* 721, 732–35 (Spring/Summer 1985) [hereinafter *Regulation of Casino Industry*]. "The statutory and administrative controls over casino operations established by the Act are extraordinary pervasive and intensive.... The regulatory scheme is both comprehensive and minutely elaborate." *Knight, supra*, 86 *N.J.* at 380–81, 431 *A.*2d 833 (citation omitted). Furthermore, "[t]he Legislature took considerable pains to determine and expound the State's public policy involving casino gambling." *Id.* at 381, 431 *A.*2d 833. As such, the "declaration of policy and legislative findings" provided by the Legislature states, in pertinent part, that:

(6) An integral and essential element of the regulation and control of such casino facilities by the State rests in the public confidence and trust in the credibility and integrity of the regulatory process and of casino operations. To further such public confidence and trust, the regulatory provisions of this act are designed to extend strict State regulation to all persons, locations, practices and associations related to the operation of licensed casino enterprises and all related service industries as herein provided....

(7) Legalized casino gambling in New Jersey can attain, maintain and retain integrity, public confidence and trust, and remain compatible with the general public interest only under such a system of control and regulation as insurers [sic], so far as practicable, the exclusion from participation therein of persons with known criminal records, habits or associations, and the exclusion or removal from any positions of authority or responsibility within casino gaming operations and establishments of any persons known to be so deficient in business probity, ability or experience, either generally or with specific reference to gaming, as to create or enhance the dangers of unsound, unfair or illegal practices, methods and activities in the conduct of gaming or the carrying on of the business and financial arrangements incident thereto. [*N.J.S.A.* 5:12–1b.].

More specifically, in regards to "ancillary industries," such as UPS, the Act provides that:

> (9) Since casino operations are especially sensitive and in need of public control and supervision, and *since it is vital to the interests of the State to prevent entry, directly or indirectly, into such operations or the ancillary industries* regulated by this act of persons who have pursued economic gains in an occupational manner or context which are in violation of the criminal or civil public policies of this State, *the regulatory and investigatory powers and duties shall be exercised to the fullest extent consistent with law to avoid entry of such persons into the casino operations or the ancillary industries regulated by this act.* [*N.J.S.A.* 5:12-1b(9) (emphasis added)].

*See also Regulations of Casino Industry, supra,* 16 *Rutgers L.J.* at 744–49.

In order to implement these goals, the Act vests the Commission with broad powers and duties. *N.J.S.A.* 5:12-63 *et seq.* These powers include the Commission's responsibility "[t]o hear and decide promptly and in reasonable order all license, registration, certificate, and permit applications and causes affecting the granting, suspension, revocation or renewal thereof." *N.J.S.A.* 5:12-63(a); *see also N.J.S.A.* 5:12-64.

*N.J.S.A.* 5:12-92(c) requires all casino service industries [1] to be licensed in accordance with the regulations of the Commission. Specifically, *N.J.S.A.* 5:12-92(c) and (d) provide:

---

[1]The Act defines "Casino Service Industry" as:

> *Any form of enterprise which provides casino applicants or licensees with goods or services regarding* the realty, construction, maintenance, or *business of a proposed or existing casino hotel or related facility on a regular or continuing basis,* including, without limitation, security businesses, gaming schools, manufacturers, distributors and servicers of gaming devices or equipment, garbage haulers, maintenance companies, food purveyors, and construction companies. Notwithstanding the foregoing, any form of enterprise engaged in the manufacture, sale, distribution or repair of slot machines within New Jersey, other than antique slot machines as defined in *N.J.S.* 2C:37-7, shall be considered a casino service industry for the purposes of this act regardless of the nature of its business relationship, if any, with licensed casinos in this State.
>
> For the purposes of this section, "casino applicant" includes any person required to hold a casino license pursuant to section 82 of P.L.1977, c. 110 (C. 5:12–82) who has applied to the commission for a casino license or any

c. All casino service industries not included in subsection a. of this section shall be licensed in accordance with rules of the commission prior to commencement or continuation of any business with a casino applicant or licensee or its employees or agents. Such casino service industries, whether or not directly related to gaming operations, shall include suppliers of alcoholic beverages, food and nonalcoholic beverages; garbage handlers; vending machine providers; linen suppliers; maintenance companies; shopkeepers located within the approved hotels; limousine services and construction companies contracting with casino applicants or licensees or their employees or agents. *The commission may exempt any person or field of commerce from the licensing requirements of this subsection if the person or field of commerce demonstrates (1) that it is regulated by a public agency or that it will provide goods or services in insubstantial or insignificant amounts or quantities, and (2) that licensing is not deemed necessary in order to protect the public interest or to accomplish the policies established by this act.* Upon granting an exemption or at any time thereafter, the commission may limit or place such restrictions thereupon as it may deem necessary in the public interest, and shall require the exempted person to cooperate with the commission and the division and, upon request, to provide information in the same manner as required of a casino service industry licensed pursuant to this subsection; provided, however, that no exemption be granted unless the casino service industry complies with the requirements of sections 134 and 135 of this act.

d. Licensure pursuant to subsection c. of this section of any casino service industry may be denied to any applicant disqualified in accordance with the criteria contained in section 86 of this act. [ (emphasis added) ].

*See N.J.A.C.* 19:41–1.2 [2]; *see also N.J.A.C.* 19:41–3.2 (regulations regarding individual qualifications); *N.J.A.C.* 19:43–1.2(b) and (c) (regulations defining "regular and continuing basis").

---

approval required under P.L.1977, c. 110 (C. 5:12–1 et seq.). [*N.J.S.A.* 5:12–12 (emphasis added) ].

[2]Similarly, the Commission's regulations provide, in pertinent part:

*N.J.A.C.* 19:41–1.2 *Casino service industry licenses*

(a) No enterprise shall, on a regular or continuing basis, provide any goods or services to or conduct any business whatsoever with a casino, a casino licensee, its employees or agents, whether or not said goods, services or business directly relates to casino or gaming activity, unless a casino service industry license authorizing the particular casino service business shall have first been issued to the enterprise.

\*   \*   \*   \*   \*   \*   \*   \*

(e) The following casino service industry enterprises shall be required to be licensed as casino service industries in accordance with sections 92c and d of the Act:

Furthermore, the Commission's regulations *N.J.A.C.* 19:41–1.2(f) model that of *N.J.S.A.* 5:12–92(c) by requiring that:

(f) The Commission may exempt any person or field of commerce from the casino service industry licensing requirements of sections 92c and d of the Act if it finds:

    1. That such person or field of commerce is regulated by a public agency; and

    2. That licensure is not necessary to protect the public interest; and

    3. That licensure is not necessary to accomplish the policies established by the Act.

Finally, the Commission's "standards for qualifications," *N.J.A.C.* 19:43–1.3(c), further require that:

(c) Each applicant required to be licensed as a casino service industry in accordance with subsections 92c and d of the Act shall, prior to the issuance of any casino service industry license, produce such information and documentation, including without limitation as to the generality of the foregoing its financial books and records, and assurances to *establish by clear and convincing evidence its good character, honesty and integrity.* [ (Emphasis added) ].

*See also N.J.A.C.* 19:43–1.4.

While not formally embodied in the regulation, the Commission in this case interpreted the first of the criteria of *N.J.S.A.* 5:12–92(c) as requiring regulation which is substantially similar to that under the Act in terms of investigations into honesty, integrity and criminal history.[3] Furthermore, the Commission's

---

1. All enterprises providing goods or services or doing any business whatsoever which does not directly relate to casino. or gaming activity. [*N.J.A.C.* 19:41–1.2].

[3]The Commission's regulations require an applicant for a CSI license to produce "information, documentation and assurances" which establish by clear and convincing evidence the applicant's "financial stability, integrity and responsibility" and the applicant's "good character, honesty, and integrity" of "all officers, directors ·and trustees" and certain "financial backers." *N.J.A.C.* 19:43–1.3(b). All owners, managers, supervisory personnel, principal employees and sales representatives must also satisfy the requirements for licensing of casino key employees set forth in *N.J.S.A.* 5:12–89. *N.J.A.C.* 19:43–1.3(b)4. *N.J.S.A.* 5:12–89b(2) requires an applicant to produce information relating to "family, habits, character, reputation, criminal and arrest record, business activities, financial affairs, and business, professional and personal associates, covering at least the 10–year period immediately preceding the filing of the application."

application of *N.J.S.A.* 5:12–92(c) to UPS cannot be considered purely a matter of statutory interpretation. The grant of an exemption may not be a ministerial act which flows automatically or be from a given interpretation of the statute, but is an exercise of the Commission's judgment that the public interest does or does not require regulation of an entity. *N.J.S.A.* 5:12–92(c).

"Judicial review of administrative actions is limited in scope." *Barone v. D. of Human Serv., Div. of Med. Asst.*, 210 *N.J.Super.* 276, 284, 509 *A.2d* 786 (App.Div.1986), *aff'd*, 107 *N.J.* 355, 526 *A.2d* 1055 (1987) (citing *Gloucester Cty. Welfare Bd. v. N.J. Civ. Serv. Comm'n*, 93 *N.J.* 384, 390, 461 *A.2d* 575 (1983)). As our Supreme Court stated in *Texter v. Human Services Dep't.*, 88 *N.J.* 376, 382–83, 443 *A.2d* 178 (1982):

> Judicial review of administrative action is a limited inquiry into whether the action is arbitrary, capricious and unreasonable or unsupported by substantial credible evidence. *Henry v. Rahway State Prison*, 81 *N.J.* 571, 579–580 [410 *A.2d* 686] (1980). This limited review prevents the courts from usurping policy decisions from other branches of government. *See Newark v. Natural Resource Counc. Dept. of Environmental Protection*, 82 *N.J.* 530, 542 [414 *A.2d* 1304] (1980) [*cert. denied*, 449 *U.S.* 983, 101 *S.Ct.* 400, 66 *L.Ed.2d* 245 (1980)]. Courts, however, have discretion to remand administrative action for further agency proceedings in the interest of justice. *Wilson v. Mountainside*, 42 *N.J.* 426, 442, 201 *A.2d* 540 (1964).

*See Matter of Warren*, 117 *N.J.* 295, 296–97, 566 *A.2d* 534 (1989); *Barry v. Arrow Pontiac, Inc.*, 100 *N.J.* 57, 71, 494 *A.2d* 804 (1985); *Gloucester Cty. Welfare Bd. v. N.J. Civ. Serv. Comm'n*, 93 *N.J.* 384, 391, 461 *A.2d* 575 (1983); *Adamar v. Dept. of Law*, 250 *N.J.Super.* 275, 295, 593 *A.2d* 1237 (App.Div. 1991); *Matter of Sheriff's Officer (PC2209J)*, 226 *N.J.Super.* 17, 21, 543 *A.2d* 462 (App.Div.1988); *Capodilupo v. W. Orange Tp. Ed. Bd.*, 218 *N.J.Super.* 510, 516, 528 *A.2d* 73 (App.Div.),

---

No casino license or CSI license will be granted to an applicant who has been convicted of any one of the numerous criminal offenses listed in *N.J.S.A.* 5:12–86c(1). *N.J.S.A.* 5:12–86c; *N.J.S.A.* 5:12–89d.

The Commission or Division is authorized to make such inquiry or investigation into an applicant or licensee—or any person involved with an applicant or licensee—as it may deem appropriate. *N.J.A.C.* 19:43–1.7.

*certif. denied,* 109 *N.J.* 514, 537 *A.2d* 1300 (1987). Our Supreme Court has more recently further noted that the

shorthand expression for the scope of judicial review really encompasses three inquiries: (1) whether the agency's action violates the enabling act's express or implied legislative policies; (2) whether there is substantial evidence in the record to support the findings on which the agency based its action; and (3) whether, in applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not reasonably have been made on a showing of the relevant factors. *Campbell v. Department of Civil Serv.,* 39 *N.J.* 556, 562 [189 *A.2d* 712] (1963). [*Matter of Warren, supra,* 117 *N.J.* at 296–97, 566 *A.2d* 534].

Furthermore, it is axiomatic that "[t]he grant of authority to an administrative agency is to be liberally construed to enable the agency to accomplish the Legislature's goals." *Gloucester Cty. Welfare Bd., supra,* 93 *N.J.* at 390, 461 *A.2d* 575; *accord Barry, supra,* 100 *N.J.* at 70, 494 *A.2d* 804; *see Petition of Adamar of New Jersey,* 222 *N.J.Super.* 464, 470, 537 *A.2d* 704 (App.Div.1988); *see also K.P. v. Albanese,* 204 *N.J.Super.* 166, 176, 497 *A.2d* 1276 (App.Div.1985), *certif denied,* 102 *N.J.* 355, 508 *A.2d* 225 (1987); *In re New Jersey Bd. of Public Utilities,* 200 *N.J.Super.* 544, 557, 491 *A.2d* 1295 (App.Div.1985). Similarly, a statute is to "be interpreted in an integrated way without undue emphasis on any particular word or phrase and, if possible, in a manner which harmonizes all of its parts so as to do justice to its overall meaning." *Zimmerman v. Mun. Clerk of Tp. of Berkeley,* 201 *N.J.Super.* 363, 368, 493 *A.2d* 62 (App.Div.1985) (citing *Alexander v. N.J. Power & Light Co.,* 21 *N.J.* 373, 377–79, 122 *A.2d* 339 (1956)). "In that regard, our Supreme Court has recognized 'the strong state interest in promoting scrupulous conduct by the casino industry and regulatory officials.'" *Petition of Adamar, supra,* 222 *N.J.Super.* at 470, 537 *A.2d* 704 (quoting *Greenberg v. Kimmelman,* 99 *N.J.* 552, 560, 494 *A.2d* 294 (1985)).

Moreover, in a "complex area where the Legislature has delegated a great amount of discretion to the administrative experts, deference must be accorded to the administrative agency's expertise and experience in its domain." *Riverside General v. N.J. Hosp. Rate Setting Com'n,* 98 *N.J.* 458, 469, 487 *A.2d*

714 (1985). Thus, our courts "place[ ] great weight on the interpretation of legislation by the administrative agency to whom its enforcement is entrusted." *Medical Soc. v. Dept. of Law & P. Safety,* 120 *N.J.* 18, 26, 575 *A.*2d 1348 (1990) (citing *Peper v. Princeton University Board of Trustees,* 77 *N.J.* 55, 69–70, 389 *A.*2d 465 (1978)); *see Smith v. Director, Div. of Taxation,* 108 *N.J.* 19, 25, 527 *A.*2d 843 (1987); *Metromedia, Inc. v. Director, Div. of Taxation,* 97 *N.J.* 313, 327, 478 *A.*2d 742 (1984); *Petition of Adamar, supra,* 222 *N.J.Super.* at 469–70, 537 *A.*2d 704. Additionally, "[d]elegation of authority to an administrative agency is construed liberally when the agency is concerned with the protection of health and welfare of the public." *Barone, supra,* 210 *N.J.Super.* at 285, 509 *A.*2d 786 (see citations therein); *see also In re Guardianship Services Regulations,* 198 *N.J.Super.* 132, 143, 486 *A.*2d 888 (App.Div. 1984), *modified,* 103 *N.J.* 619, 512 *A.*2d 453 (1986). Finally,

Where action of an administrative agency is challenged, "a presumption of reasonableness attaches to the action of an administrative agency and the party who challenges the validity of that action has the burden of showing that it was arbitrary, unreasonable or capricious." *Boyle v. Riti,* 175 *N.J.Super.* 158, 166 [417 *A.*2d 1091] (App.Div.1980). *See In re Guardianship Services Regulations, supra,* 198 *N.J.Super.* at 137 [486 *A.*2d 888]. [*Barone, supra,* 210 *N.J.Super.* at 285, 509 *A.*2d 786].

*See Morris Cty. v. Skokowski,* 86 *N.J.* 419, 424, 432 *A.*2d 31 (1981); *Matter of Aetna Cas. and Sur. Co.,* 248 *N.J.Super.* 367, 376, 591 *A.*2d 631 (App.Div.1991), *certif denied,* 126 *N.J.* 385, 599 *A.*2d 162 (1991), *cert. denied,* —— *U.S.* ——, 112 *S.Ct.* 1244, 117 *L.Ed.*2d 476 (1992); *K.P. v. Albanese, supra,* 204 *N.J.Super.* at 175, 497 *A.*2d 1276.

One of the key "overall meanings" of the Act is to prevent the infiltration into the casino industry, directly or indirectly, of persons who have pursued economic gains in an occupational manner or context which are in violation of the criminal or civil public policies of New Jersey. *N.J.S.A.* 5:12–1b(9). To this end, a non-gaming CSI license will be denied if an applicant has been convicted of any one of several enumerated criminal offenses, or if the applicant has failed to cooperate with the

Commission or to disclose material facts. *N.J.S.A.* 5:12–86c; *N.J.S.A.* 5:12–92d. By regulation, a non-gaming CSI must demonstrate by clear and convincing evidence its good character, honesty and integrity. *N.J.A.C.* 19:43–1.3(c).

As such, of primary concern when applying the "regulated by a public agency" criterion, the Commission consistently inquires into whether an alternative regulatory scheme includes investigations into character and honesty. *See, e.g., In the Matter of the Application of AT & T Communications of New Jersey, Inc. and Petition of U.S. Sprint Communications Co., L.P., For Exemption From Casino Service Industry Licensure,* (April 12, 1989) [hereinafter *AT & T/Sprint* ]; *In the Matter of the Petition of Galaxy Airlines,* (May 29, 1985) [hereinafter *Galaxy Airlines* ]; *In the Matter of the Petition of Cape Transit Corp. For A Declaratory Ruling That It Is Not A Casino Service Industry Or For An Exemption From Casino Service Industry Licensure, Order No. 87 45–8* [hereinafter *Cape Transit* ]. While the Commission has recognized the heightened level of scrutiny over character and honesty imposed by the Act, it has granted exemptions where other regulations may not meet the heightened standard of the Act, but where the "overall effect" or combination of other relevant factors provide "virtually equivalent protection for the public" as does the Act. *AT & T/Sprint* (Commission Armstrong); *see also* New Jersey Casino Control Commission Staff Memorandum regarding Travel Industry Exemption (July 7, 1978) [hereinafter Travel Industry Exemption Memorandum]. Thus, "the importance of such regulation depends upon the subject matter of the proposed exemption." Travel Industry Exemption Memorandum.

In *AT & T/Sprint,* the Commission granted AT & T and Sprint exemptions because of the absence of direct contact between the companies and their casino customers, coupled with the extensive financial, managerial, and operational regulation of the industries by the Board of Public Utilities (BPU), which obviated the Commission's need to regulate the compa-

nies under the Act in order to prevent unsavory persons from infiltrating and gaining control of the companies.

Similarly, the Commission has denied exemptions for companies which were not subject to regulation equivalent to that under the Act regarding good character and lack of criminal convictions. *See Galaxy Airlines; Cape Transit.* In *Cape Transit*, the Commission specifically concluded that ICC regulation was not a sufficient substitute for licensure under the Act as ICC investigates only the ability of a company to provide transportation services, and not its good character, honesty and integrity. As such, during the hearing Vice–Chair Zeitz, in part, commented that:

> Beyond [interpreting whether "regular and continuing" applies], Cape Transit had asked, if it is found to be a casino service industry required to file for licensure, it be exempted on the basis of its regulation by the I.C.C. and the D.O.T., asserting there are sufficient similarities in that regulation. I would agree with Mr. McDonough there really aren't. The I.C.C. and the D.O.T. regulate transportation, the provision of transportation services. They don't regulate the fundamental, that fundamental threshold question which is always before the agency which is good character, honesty and integrity.

The Commission then unanimously voted to deny the exemption.

In *Galaxy Airlines*, the Commission unanimously voted to deny the application for exemption to an airline despite regulation by the Federal Aviation Administration (FAA), as the Commission found the FAA regulations were not comparable to the Act. During the hearing, Commissioner Zeitz, in part, commented that:

> The C.A.B. and F.A.A. on the basis of the papers we've seen and the arguments we've heard, while they may examine it, as Mr. Stebbins indicated on some limited basis, the background of individuals and of corporations in the air industry, they do not do so apparently for the purpose of making specific findings on licensure as to good character, honesty and integrity.
>
> Therefore I do not think their purpose is the same.

Finally, in 1978, the Commission granted a blanket exemption

for the travel industry based in part on ICC regulation.[4] UPS urges that this ruling by the Commission indicates the precedent that regulation by the ICC has "been deemed a 'sufficient substitute' for monitoring by the Commission and the Division of Gaming Enforcement." We disagree.

The exemption the Commission granted to the travel industry is clearly distinguishable from UPS's application. In July 1978, an internal memorandum [5] of the Commission recommended a limited exemption for the "thousands of travel industry enterprises" which deal with casino hotels. The exemption was granted only with respect to those enterprises which: (1) were regulated by the ICC; (2) provided standardized, routine services regulated by tariff; (3) rarely had representatives at casino hotels; and (4) experienced high levels of competition. Thus, in the memorandum supplied to the Commission, the Senior Assistant Counsel to the Commission concluded:

> Notwithstanding the fact that an enterprise limits its business to that covered by the standard rates, an enterprise will not be exempted unless it is "regulated by a public agency." *However, the importance of such regulation depends upon the subject matter of the proposed exemption. In this case, the limitation of the exemption to minimal, standardized contacts, the fact that such travel industry enterprises will rarely be physically present at the hotel, the large number of such enterprises and the resulting high level of competition within the industry combine to reduce the importance of independent regulations of these enterprises. Thus, the public agency regulation requirement would be satisfied here by regulation which is considerably less stringent than that which would otherwise be imposed by the Commission.*

---

[4]In 1984, the Commission modified the travel industry exemption by imposing the requirement that the business transacted "does not exceed ten percent (10%) of the cost of the accommodations provided" and "abolished", in part, the requirement for an exemption from licensure that the travel industry enterprise be licensed by the ICC, "Public Utilities Commission, Air Traffic Conference, or International Air Transport Association." New Jersey Casino Control Commission, *Resolution No. 84-941.*

[5]The Commission indicated that this memorandum "was approved and adopted by the Commission on July 11, 1978, and thereafter became Formal Opinion # 6."

For these reasons, it is recommended that travel industry enterprises which are licensed or certificated by the Interstate Commerce Commission (motor bus carriers and motor bus tour brokers) be qualified for the proposed exemption if they otherwise conform to the stated restriction. Under federal law, an I.C.C. license or certificate may only issue to an enterprise which is "fit, willing and able properly to perform" the proposed service. 49 *U.S.C.* Sections 307 and 311. *While the I.C.C. concentrates primarily on the experience and ability of the enterprise and its fitness to provide the public with safe and convenient transportation, this form of regulation is sufficient in this instance to satisfy the public interest and Section 92c of the Act.* Similarly, autobus carriers holding certificates of public convenience and necessity from the New Jersey Public Utilities Commission should also be qualified for this limited purpose. *See N.J.S.A.* 48:4–3. [ (Emphasis added) ].

Furthermore, unlike UPS, the retail travel agents associated with travel agencies were regulated by the International Air Transport Association and the Air Traffic Conference. Both of these entities disqualified agents who have been convicted of a felony, of a misdemeanor related to financial activities, or of a breach of fiduciary obligation, unless it can be shown that the agency can be relied upon to adhere to the obligations and duties of an approved agent. This regulation supplied the background check which the Commission found absent in UPS's case.

Moreover, UPS's argument that the Commission acted unreasonably and arbitrarily is without merit. First, the *AT & T/Sprint* decision, upon which UPS relies in support of ICC regulation as a sufficient substitute, is distinguishable. There, the Commission focused on the extensive financial, management, and customer service regulations of the companies by the BPU, the lack of physical contact between the telephone companies and the casinos, the fact that their charges were established by tariff, and the impossibility of acquiring control of either company without obtaining BPU approval. Although UPS submitted that its charges were regulated by tariff and that any proposed merger or acquisition must be approved by the ICC, the cases are sufficiently different. *See* 49 *U.S.C.A.* §§ 10701(a); 10741(a); 10762(a)(1); 11343 (Supp.1991). Most importantly, unlike the telephone companies, UPS employees have some contact with casino employees. Furthermore, UPS

failed to present any evidence that the ICC monitors the financial and management aspects of its organization in the same way that the BPU regulates these matters with respect to public utilities.

Second, the Commission's decision is wholly supported by the underlying intent and policy of the Act. *N.J.S.A.* 5:12–1b; *N.J.A.C.* 19:41–3.2(f). In light of the Act's primary goal of preventing direct or indirect criminal infiltration of the casino industry, it appears eminently reasonable for the Commission to have interpreted the "regulated by a public agency" requirement in the context of the Act as a whole, and with an eye toward gauging whether that alternative regulatory scheme also screens an entity and its employees for absence of a criminal record and general good character. Therefore, the Commission's interpretation is a reasonable one and gives full effect to the "regulated by a public agency" requirement.

In sum, we are satisfied from our study of the record and the arguments presented that the final administrative action of the Commission was not arbitrary, capricious or unreasonable; that it was supported by the evidence, and that it did not violate legislative policies expressed or fairly implied in the statutory scheme administered by the Board. *See Matter of Warren, supra,* 117 *N.J.* at 296–97, 566 *A.*2d 534; *Henry v. Rahway State Prison,* 81 *N.J.* 571, 579–80, 410 *A.*2d 686 (1980); *Campbell v. Department of Service,* 39 *N.J.* 556, 562, 189 *A.*2d 712 (1963); *Matter of Fiorillo Bros. of N.J.,* 242 *N.J.Super.* 667, 674–75, 577 *A.*2d 1316 (App.Div.), *certif. denied,* 122 *N.J.* 363, 585 *A.*2d 371 (1990); *In re Waste Disposal Agreement,* 237 *N.J.Super.* 516, 526–29, 568 *A.*2d 547 (App.Div.), *certif. denied,* 121 *N.J.* 647, 583 *A.*2d 337 (1990); *Public Advocate Dep't v. Public Utilities Bd.,* 189 *N.J.Super.* 491, 499, 460 *A.*2d 1057 (App.Div.1983); *In re Boardwalk Regency Casino License Application of New Jersey,* 180 *N.J.Super.* 324, 334–35, 434 *A.*2d 1111 (App.Div.1981), *modified,* 90 *N.J.* 361, 447 *A.*2d 1335 (1982), *appeal dismissed,* 459 *U.S.* 1081, 103 *S.Ct.* 562, 74 *L.Ed.*2d 927 (1982); *R.* 2:11–3(e)(1)(D). Moreover, all of the

issues of law raised are clearly without merit. *R.* 2:11–3(e)(1)(E).

Accordingly, the final administrative action of the Commission and the order denying the motion for a rehearing under review are affirmed.