950 A.2d 231 (2008)
401 N.J. Super. 247
In the Matter of the Petition of ADAMAR OF NEW JERSEY, INC. for Renewal of its Casino and Casino Hotel Alcoholic Beverage Licenses and in the Matter of the Plenary Qualification of Tropicana Casino and Resorts, Inc., Tropicana Entertainment Holdings, LLC, Tropicana Entertainment Intermediate Holdings, LLC and Tropicana Entertainment, LLC as Holding Company of Adamar of New Jersey, Inc.
No. A-1727-07T1
Superior Court of New Jersey, Appellate Division.
Argued May 13, 2008.
Decided July 1, 2008.
*234 Karen A. Confoy, Trenton, argued the cause for appellants Adamar of New Jersey, Inc., Tropicana Casino and Resorts, Inc., Tropicana Entertainment Holdings, LLC, Tropicana Entertainment Intermediate Holdings, LLC, and Tropicana Entertainment, LLC, as holding company of Adamar of New Jersey, Inc. (Sterns & Weinroth, P.C., attorneys; Paul M. O'Gara, of counsel; Ms. Confoy, Dennis Daly and Erica S. Helms, on the briefs).
Beverly Tanenhaus, Deputy Attorney General argued the cause for respondent Division of Gaming Enforcement (Anne Milgram, Attorney General, attorney; Josh Lichtblau, Assistant Attorney General, of counsel; Ms. Tanenhaus, on the brief).
Steven M. Ingis, Assistant General Counsel, argued the cause for respondent New Jersey Casino Control Commission (Dianna W. Fauntleroy, General Counsel, attorney; Mr. Ingis and Seth H. Briliant, Senior Counsel, on the brief).
Before Judges CUFF, SIMONELLI and KING.
The opinion of the court was delivered by
*235 CUFF, P.J.A.D.
Adamar of New Jersey, Inc. (Adamar), the owner and operator of the Tropicana Casino and Resort Atlantic City (Tropicana AC),[1] appeals from a final order of the Casino Control Commission (Commission) denying its applications for renewal of Tropicana AC's casino and casino hotel alcoholic beverage licenses (collectively casino licenses) and for plenary qualification of Tropicana Casinos and Resorts, Inc. (TCR),[2] as the parent company of Tropicana AC. The effect of this order was to activate the Interim Casino Authorization (ICA) trust and to institute a conservatorship in order for the casino to remain in continuous operation, to ensure that all prerogatives attendant to the former casino licenses remained in place, and to ensure an orderly disposition of the property. In addition, the Commission imposed civil penalties of $750,000 against TCR and Tropicana AC (collectively Tropicana) on a complaint filed by the Division of Gaming Enforcement (DGE) due to Tropicana's failure to constitute and utilize an independent audit committee.
On appeal, Tropicana argues that the Commission order must be reversed because the Commission applied standards for maintenance of a first class facility, business ability, and the organization and operation of an independent audit committee that had not been adopted as regulations to guide a licensee in the operation of its business. Tropicana also argues that the Commission exceeded its authority and made findings of fact that were unsupported by the record. The Commission argues that the decision to deny relicensure is supported by ample credible evidence. Furthermore, the Commission asserts that it acted in its adjudicatory role and the existing licensing criteria governing the Commission decision is sufficient to inform prospective and existing licensees of the requirements for licensure. The Commission also contends that Tropicana knew or should have known that having obtained ICA did not bestow any guarantee of license renewal.

I
We commence our discussion with a review of the facts concerning the acquisition of the Tropicana AC facility, the grant of ICA, and the operation of Tropicana AC during the interim authorization period.
On November 12, 2003, the Commission renewed the casino licenses held by Tropicana AC for a four-year term ending on November 30, 2007. On May 19, 2006, Tropicana AC's original parent company Aztar Corporation (Aztar), a publicly traded entity,[3] agreed to a merger that would result in Aztar and Tropicana AC becoming subsidiaries of TCR, a private company wholly owned by William Yung, III.
Prior to TCR's acquisition of Aztar, Yung operated numerous hotel properties.[4] *236 He is the largest holder of full service Marriott franchises in the United States. He also owned and operated casino properties, including a casino in Lake Tahoe and various riverboat gambling sites in the midwest and south. It was undisputed that Yung and his organization had no prior experience operating a casino resort of the scale of the Aztar Atlantic City and Las Vegas casino and hotel properties acquired in May 2006.
On June 6, 2006, TCR filed a petition with the Commission seeking ICA and plenary qualification[5] as a holding company for Tropicana AC pursuant to N.J.S.A. 5:12-95.12 to -95.16. Tropicana submitted additional petitions seeking declaratory rulings on certain provisions of N.J.S.A. 5:12-82d and specific debt transactions, and for the temporary licensure of Fred Buro as a key casino employee pursuant to N.J.S.A. 5:12-89e. Tropicana also sought permission from the Commission to permit Buro to assume the duties and exercise the powers of President and Chief Operating Officer (COO) of Tropicana AC without first having been found qualified pursuant to N.J.A.C. 19:43-2.6. Following a hearing on November 2, 2006, the Commission granted ICA to TCR and allowed Buro to assume his duties as COO. On January 3, 2007, TCR closed its purchase of Aztar.
On June 20, 2007, the Commission conditionally approved Tropicana's June 14, 2007 restated and amended petition concerning the composition of its independent audit committee. The Commission also granted the petitions for the approval of Jeffrey Silver, as the sole member of the independent audit committee, and Karin Brugler, as the Corporate Director of Internal Audit of Tropicana Entertainment, LLC (TEL)[6] and TCR.
On June 26, 2007, TCR filed a petition with the Commission seeking an extension of its ICA approval through January 2, 2008, which the Commission approved. On August 2, 2007, Tropicana filed a petition for a five-year renewal of its casino licenses. On September 26, 2007, Tropicana filed a petition to disband the TEL audit committee and to reconstitute it as the audit committee of its subsidiary, Ramada NJ Holdings Corp. (Ramada NJ), because Tropicana felt an audit committee at that level would be "more effective" because Ramada NJ only has New Jersey subsidiaries.
When TCR appeared before the Commission in support of its ICA application, *237 Yung testified that he contemplated a measured reduction in employment levels at Tropicana AC and believed it could be accomplished by attrition. By the end of January 2007, 161 employees had been laid off, and thirty-five persons had been fired. By the end of August 2007, 1059 employees had been terminated, while only 381 employees had been hired. By the end of October 2007, Tropicana AC was operating with only 80% of its former workforce. Cleanliness issues surfaced in March 2007, and some of those issues were still present in June 2007. The record suggests that the condition of the resort negatively affected Tropicana AC's convention trade. The Commission was troubled by the extent of the reduction in employees because the scope and manner of the workforce reductions varied markedly from Yung's initial representations.
Although the scope of the workforce reduction concerned the Commission, terminations in certain mandatory departments triggered concerns about the ability of Tropicana AC to comply with the regulatory scheme extant in New Jersey. Initially, Tropicana AC proposed to reduce the number of locksmiths and slot technicians. Yung saw no need for locksmiths despite the attendant need for these positions to maintain the regulatorily mandated security measures.
In the first eight months of operation, Tropicana AC terminated ninety-one employees in its security department and hired fifty-eight employees for a net loss of thirty-three employees. Most of the terminations occurred in the first three months of operation and the loss of employees left one shift with inadequate security for trolley drops and bill changer pick-ups. To compensate, Tropicana AC impermissibly removed personnel from some mandatory posts to perform the pick-ups and drops. As a result, some mandatory posts were unattended. Moreover, despite a recommendation to increase staff, further reductions in security staff occurred.
In August 2007, the Commission met with Yung, Donna More and Kevin Preston to discuss further layoffs. More was TCR general counsel, and Preston was Senior Vice President for Casino Operations. TCR enumerated another 320 "potential layoffs" at Tropicana AC, including seventy security positions. It explained that the number of terminations was fashioned on an analysis of the security force at another casino TCR deemed comparable. The Commission instructed Tropicana AC that all aspects of the layoff proposal, including the security reductions, required further study and should not be implemented pending further review by the Commission. Four days later, Michael Lyons, who advocated an increase in security personnel, was terminated as Director of Security at Tropicana AC. The record also reveals that Yung was reluctant to discuss proposed personnel decisions with the Commission.
Moreover, a Commission inspector discovered that the Tropicana AC security supervisor assigned to the casino was also impermissibly overseeing hotel security. Finally, in September 2007 Tropicana failed to replace three security officers who were assigned to mandatory roving security posts but who were reassigned to cover bill changer and trolley escorts. This violation resembled similar regulatory lapses that had occurred in April 2007.[7]
*238 In addition to massive staff layoffs, there was significant turnover of senior management at Tropicana. When TCR assumed the operation of Tropicana AC, Howard Reinhardt was TCR's Senior Vice President of Casino Operations. He was replaced by Preston, who was responsible for all of TCR's gaming operations, marketing and security. At TCR, Richard Fitzpatrick held the position of Senior Vice President, Chief Financial Officer, and Treasurer until July 2007. John Jacob replaced Fitzpatrick but resigned three months later. Theodore Mitchel replaced Jacob as TCR's Senior Vice President, Chief Financial Officer, and Treasurer.
Buro, who was permitted by the Commission to assume his duties as President and COO of Tropicana AC without having obtained key employee licensure, was terminated in August 2007. Mark Giannantonio was promoted from Executive Vice President of Operations to President and COO at Tropicana AC to replace Buro. Lyons commenced employment at Tropicana AC as Director of Security in January 2007. Buro hired him; Lyons was terminated soon after Buro was terminated.
In addition to the turnover in senior management ranks, the Commission expressed concern with the substitution of employees with extensive Atlantic City casino experience with personnel with less casino experience or experience in smaller casino markets. Reinhardt had worked at Tropicana AC for ten years. Preston, his replacement, had casino management experience but at smaller casino operations.
Buro had served as Chief Marketing Officer for Columbia Sussex since March 2003. He commenced his employment in the gaming industry in 1989 at Trump Hotel and Casino Resorts where he held various positions, including marketing consultant, Director of Marketing, Senior Vice President of Marketing, Executive Vice President of Marketing, General Manager, and finally President and COO. He served in the latter position for just over a year. Between June 2000, when he left Trump Hotel and Casino Resorts, until March 2003, when he joined Columbia Sussex, Buro was employed as the General Manager of Penn National Gaming Inc.'s largest property, Charles Town Races and Slots in West Virginia. By contrast, prior to succeeding Buro, Giannantonio was the Executive Vice President of Operations overseeing the hotel, food and beverage, and non-casino departments at Tropicana AC. He started in the casino resort industry in Atlantic City as a room service waiter and rose through the ranks. Prior to his current position, he never had any responsibility for the casino operations of a casino resort.
Lyons was a former State Trooper who had worked in Atlantic City for DGE and the casino intelligence section of the New Jersey State Police. Following his retirement from the State Police, he joined Trump Marina for seven years, where he started as an investigator and eventually served as Director of Security. He also spent a year at the Taj Mahal Casino as the Director of Corporate Training, Security in Training. Glenn Koehler, the TCR Director of Security, Risk Management and Surveillance, held the position since January 2007, but reported doing the same type of work at various properties other than Tropicana AC since September 2003. Koehler was not licensed in New Jersey.
Jacob, who resigned after three months as Senior Vice President and Chief Financial *239 Officer at TCR, had no prior gaming, hotel or leisure and entertainment management experience. His replacement, Mitchel, had been employed as a senior financial executive at Columbia Sussex for eighteen years. His involvement in licensure matters was limited to gathering information required for license applications.
Brian Doyle, the TCR Director of Compliance, held that position since November 2006. His previous casino experience included employment at the Grand Victoria Casino and Resort in Indiana and on various riverboats in Iowa. More opined that Doyle impressed her and was very knowledgeable about required recordkeeping and reporting of various financial transactions.
More had extensive casino regulatory experience as a regulator and counsel to licensed casino operations. Tropicana AC was her first exposure to casino regulation and operation in Atlantic City. She was one of two in-house attorneys. As general counsel for TCR, More was responsible for legal oversight, including regulatory matters, for thirteen TCR properties in four jurisdictions. In Atlantic City, one attorney was employed at Tropicana AC and was solely responsible for that property. One of the attorneys employed at the Las Vegas property had been terminated and not replaced, and a third attorney was about to be hired in the TCR home office in Kentucky.
Tropicana AC was required to have an independent audit committee in place on its first day of operation. However, Tropicana did not submit an acceptable independent audit committee proposal until June 14, 2007. The Commission promptly approved the proposed independent audit committee on June 20, 2007. The Commission found that the reason for the delay "has proven elusive." At the first meeting of the independent audit committee, no representative from the surveillance department attended the meeting. Moreover, minutes of a subsequent independent audit committee meeting in November 2007 revealed the presence of several senior management officials but no representative from the surveillance department were in attendance despite the requirement that the surveillance department report to the independent audit committee.
Tropicana AC had also entered into a casino services management agreement with TCR and a service agreement with Columbia Sussex. The casino services management agreement allowed TCR to supervise casino operations, including employment matters, staffing, marketing and advertising programs, casino layout, casino operations and procedures, gaming equipment and supply purchases, regulatory oversight as it relates to casino operations and internal audit procedure and operations, and financial matters. The service agreement with Columbia Sussex concerned hotel related services. Despite assurances that the agreements would not be implemented until approved, the Commission discovered that Columbia Sussex had charged fees to Tropicana AC for services rendered under such agreements.
Following submission of the applications for renewal and plenary qualification, DGE filed four reports with the Commission in response to Tropicana's petitions. On October 11, 2007, DGE filed a complaint against Tropicana alleging it had failed to implement a properly constituted and functioning independent audit committee and that it had failed to implement requisite lines of reporting and supervision for its internal control managers and surveillance departments.
The hearing on Tropicana's license renewal spanned part of eight days. In the course of the hearing, Tropicana presented the testimony of Yung, TCR's general *240 counsel, and current and former senior executives and managers. During closing arguments, DGE recommended renewal of Tropicana's license for a one-year period subject to twenty-six conditions.
After reviewing the statutory requirements for relicensure and plenary qualification, including financial stability, integrity and responsibility; integrity of all financial backers; good character, honesty and integrity; business ability and casino experience to establish the likelihood of creation and maintenance of a successful, efficient casino operation; and suitability of the casino and related facilities, the Commission found that Tropicana did not satisfy the requirements for relicensure and plenary qualification. It found that Tropicana's regulatory performance was "abysmal." It described Tropicana's approach to the constitution and operation of the requisite independent audit committee as intransigent due to its desire to "retain management dominance."
The Commission also found that the massive layoffs were an alternative basis to deny relicensure and plenary qualification. The Commission determined that Yung had not been forthright with the Commission concerning his plans to achieve an efficient workforce. Rather, the Commission found that Yung was determined to operate Tropicana AC in the same manner as his smaller casinos in smaller markets with little regard for the regulatory requirements in New Jersey.
Further, the Commission found Yung's lack of familiarity with certain regulatory requirements and his professed lack of understanding of Tropicana AC's management services agreement with TCR and Columbia Sussex "strained credulity." The Commission also found that the turnover of key senior management and their replacement by personnel with limited casino experience "inevitably raise[d] questions about the ability of TCR and, through it, Tropicana AC, to make the necessary choices to assemble and retain a competent team to operate in the highly regulated Atlantic City casino environment."
The Commission also found that Tropicana had demonstrated a lack of financial integrity. It noted that the massive personnel reduction had not improved the financial performance of Tropicana AC. It further found that the financing for the Aztar acquisition was structured to avoid subjecting Columbia Sussex to regulatory scrutiny as a holding company.
Finally, the Commission addressed whether Tropicana AC was a first class facility. It noted that the significant cuts in housekeeping and maintenance staff in early 2007 caused significant cleanliness issues, which, in turn, led to many customer complaints. The Commission also noted that it was hotly contested whether Tropicana AC's status as a "first class facility" should even be an issue in this case, but it determined that the issue should be addressed to complete the record. Notably, however, the Commission declared:
Let there be no mistake or misunderstanding: the previously articulated reasons and their corresponding statutory or regulatory underpinnings set forth earlier in this opinion form a sufficient independent basis upon which to deny the applications for renewal and plenary qualification.
Ultimately, the Commission concluded that Tropicana's failure to appreciate the "workings of the Atlantic City marketplace," and its failure to retain or hire personnel who possessed the knowledge required to operate within the New Jersey regulatory and business environment, coupled with its failure to educate itself about *241 such environment, demonstrated a lack of good character, honesty and integrity, and constituted "contumacious defiance of the regulatory process."

II
The role of an appellate court in reviewing a final decision of an administrative agency is limited. In re Taylor, 158 N.J. 644, 656, 731 A.2d 35 (1999). The court must give deference to such decision, unless it is arbitrary, capricious, unsupported by substantial credible evidence in the record, or is in violation of express or implicit legislative policy. Id. at 656-57, 731 A.2d 35; Karins v. City of Atl. City, 152 N.J. 532, 540, 706 A.2d 706 (1998); In re S.D., 399 N.J.Super. 107, 121, 943 A.2d 188 (App.Div.2008); In re Boardwalk Regency Corp. and DiBartolomeo, 352 N.J.Super. 285, 300-01, 800 A.2d 157 (App. Div.), certif. denied, 174 N.J. 366, 807 A.2d 197 (2002). Accordingly, this court must determine whether the Commission's findings could reasonably have been reached on sufficient credible evidence in the record, "considering `the proofs as a whole,' with due regard to the opportunity of the one who heard the witnesses to judge of their credibility." Taylor, supra, 158 N.J. at 656, 731 A.2d 35 (quoting Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965)).
It is not the function of this court to substitute its judgment for that of the Commission, "`where there may exist a difference of opinion concerning the evidential persuasiveness of the relevant [proofs].'" In re Certificate of Need Granted to The Harborage, 300 N.J.Super. 363, 379, 693 A.2d 133 (App.Div.1997) (quoting First Sav. & Loan Ass'n v. Howell, 87 N.J.Super. 318, 321-22, 209 A.2d 343 (App.Div.1965), certif. denied, 49 N.J. 368, 230 A.2d 400 (1967)). Further, this court should not "`weigh the evidence, determine the credibility of witnesses, draw inferences and conclusions from the evidence, or resolve conflicts therein.'" Ibid. (quoting De Vitis v. N.J. Racing Comm'n, 202 N.J.Super. 484, 489-90, 495 A.2d 457 (App.Div.), certif. denied, 102 N.J. 337, 508 A.2d 213 (1985).
Only when the agency's findings are clearly mistaken and "`so plainly unwarranted that the interests of justice demand intervention and correction'" should a reviewing court "`make its own findings and conclusions.'" Campbell v. N.J. Racing Comm'n, 169 N.J. 579, 587-88, 781 A.2d 1035 (2001) (quoting State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964)).
"However, in this complex area where the Legislature has delegated a great amount of discretion to the administrative experts, deference must be accorded to the administrative agency's expertise and experience in its domain." Riverside Gen. Hosp. v. N.J. Hosp. Rate Setting Comm'n, 98 N.J. 458, 469, 487 A.2d 714 (1985). Thus, this court should "place[ ] great weight on the interpretation of legislation by the administrative agency to whom its enforcement is entrusted," Peper v. Princeton University Board of Trustees, 77 N.J. 55, 69-70, 389 A.2d 465 (1978), recognizing that when an agency is charged with enforcing a statute, its interpretation of that statute should prevail "provided it is not plainly unreasonable." Metromedia, Inc. v. Dir., Div. of Taxation, 97 N.J. 313, 327, 478 A.2d 742 (1984).
Relatedly, a strong presumption of reasonableness should be accorded to an agency's exercise of its statutorily delegated duties. City of Newark v. Natural Res. Council in Dep't of Envtl. Prot., 82 N.J. 530, 539, 414 A.2d 1304, cert. denied, 449 U.S. 983, 101 S.Ct. 400, 66 L.Ed.2d 245 (1980). It follows that an appellate court should give due regard to an agency's expertise *242 where, as here, "`such expertise is a pertinent factor'" in the agency's decision. Campbell, supra, 169 N.J. at 588, 781 A.2d 1035 (quoting Close, supra, 44 N.J. at 599, 210 A.2d 753).
In 1976, the State Legislature amended article IV, § 7, ¶ 2 of the New Jersey Constitution to authorize the operation of casinos in Atlantic City. Bally Mfg. Corp. v. N.J. Casino Comm'n, 85 N.J. 325, 328, 426 A.2d 1000, appeal dismissed, 454 U.S. 804, 102 S.Ct. 77, 70 L.Ed.2d 74 (1981). In 1977, the Legislature enacted the Casino Control Act (the Act), N.J.S.A. 5:12-1 to -152, which legalized casino gambling and established an elaborate framework to regulate the casino industry. Knight v. Margate, 86 N.J. 374, 380, 431 A.2d 833 (1981).
"Crucial to this regulatory scheme is `the public confidence and trust in the credibility and integrity of the regulatory process and of casino operations.'" Campione v. Adamar of N.J., Inc., 155 N.J. 245, 255, 714 A.2d 299 (1998) (citing N.J.S.A. 5:12-1b(6)). The Legislature explained that
the regulatory provisions . . . are designed to extend strict State regulation to all persons, locations, practices and associations related to the operation of licensed casino enterprises . . . [and] licensure of a limited number of casino establishments, with the comprehensive law enforcement supervision . . . is further designed to contribute to the public confidence and trust in the efficacy and integrity of the regulatory process.
[N.J.S.A. 5:12-1b(6).]
The Act's statutory provisions cover "virtually every facet of casino gambling and its potential impact upon the public." Knight, supra, 86 N.J. at 381, 431 A.2d 833. To this end, it created a two-tiered regulatory system in which the Commission exercises quasi-legislative and quasi-judicial power pursuant to N.J.S.A. 5:12-63, while DGE conducts investigations and prosecutions under N.J.S.A. 5:12-76. Campione, supra, 155 N.J. at 256, 714 A.2d 299 (citing State, Dep't of Law & Pub. Safety v. Gonzalez, 142 N.J. 618, 624, 667 A.2d 684 (1995)).
The Act begins with a "declaration of policy and legislative findings" codified at N.J.S.A. 5:12-1b. Here, the Legislature articulated fundamental interests, including the urban redevelopment of Atlantic City, N.J.S.A. 5:12-1b(4), the strict State regulation and control of the casino industry, and "public confidence and trust in the credibility and integrity of the regulatory process and of casino operations." N.J.S.A. 5:12-1b(6).
Consequently, the Legislature vested the Commission with broad regulatory powers to carry out the expansive regulation of casinos envisioned by the statute. Boardwalk Regency Corp., supra, 352 N.J.Super. at 302, 800 A.2d 157; In re United Parcel Serv., Inc., 255 N.J.Super. 195, 202, 604 A.2d 960 (App.Div.1992). Further, the Legislature circumscribed the status of a casino license as a privilege and not a vested right, having "determined casino gambling to be a revocable, highly regulated and conditioned privilege." Knight, supra, 86 N.J. at 381, 431 A.2d 833 (citing N.J.S.A. 5:12-1b(8)).

III
We commence our discussion with the need for an independent audit committee and Tropicana's compliance with this requirement. N.J.S.A. 5:12-99a requires each applicant for a casino license to provide "a description of its initial system of internal procedures and administrative and accounting controls for gaming and simulcast wagering operations." See N.J.A.C. 19:43-10.7(a). N.J.A.C. 19:45-1.11 addresses the required organization of a casino *243 licensee and allows each licensee to tailor its organizational structure in accordance with its needs, policies and management philosophy. Nevertheless, N.J.A.C. 19:45-1.11(b) describes mandatory departments, including surveillance and internal audit, and mandatory supervisory positions within those departments.
The Commission is empowered to mandate that each casino licensee establish a system of internal controls pursuant to N.J.S.A. 5:12-99. In re Playboy-Elsinore Assocs., 203 N.J.Super. 470, 474, 497 A.2d 526 (1985). Accordingly, the Commission has adopted standards for internal controls. N.J.A.C. 19:45-1.11; Playboy-Elsinore, supra, 203 N.J.Super. at 474, 497 A.2d 526. N.J.A.C. 19:45-1.11(b)1-2 requires a casino licensee to have a surveillance department and an internal audit department. The surveillance department is generally responsible for the "clandestine surveillance" of the casino's operations. N.J.A.C. 19:45-1.11(b)1. The internal audit department is responsible for the review and implementation of a system of internal controls. N.J.A.C. 19:45-1.11(b)2. Both departments are subject to the reporting requirements specified in N.J.A.C. 19:45-1.11(c). N.J.A.C. 19:45-1.11(c)2 provides that on "matters of policy, purpose, responsibility and authority" the supervisors of the surveillance and the internal audit departments are to report to:
i. The independent audit committee of the casino licensee's board of directors;
ii. The independent audit committee of the board of directors of any holding company of the casino licensee which has absolute authority to direct the operations of the casino licensee;
iii. The senior surveillance or internal audit executive of any holding company included in (c)2ii above if such executive reports directly to the independent audit committee of the board of directors of the holding company;. . . .
In Playboy-Elsinore, supra, this court construed N.J.A.C. 19:45-1.11(c)[8] to require the insulation of the surveillance and the internal audit departments from "operating management" through reporting structures which guarantee their independence. 203 N.J.Super. at 474-75, 497 A.2d 526. We stated:
The idea is to establish lines of reporting that will guarantee independence of the various departments from one another, independence for the more sensitive functions from operating management and clear responsibility at the highest level for internal audit and surveillance responsibilities.
[Id. at 474, 497 A.2d 526.]
It is clear in this case that any time, effort and resources spent by Tropicana in forming an independent audit committee are irrelevant because the strictures and mandates of the Act were not met. Here, Tropicana does not dispute that it failed to adhere to the requirement to have a proper independent audit committee in place on January 3, 2007, when their merger closed with Aztar, and it did not form one until June 20, 2007. As such, Tropicana was squarely in violation of N.J.A.C. 19:45-1.11(c)2.
Prior to the merger, Commission staff discussed with Tropicana's counsel the need to have an independent audit committee in place that satisfied the requirements of the Act. Despite this knowledge, it failed to implement an approved committee by *244 January 3, 3007. Instead, it persisted to discuss and advocate a multi-member committee dominated by TCR management in satisfaction of the independence requirement of the regulations. This arrangement would never pass muster under the regulations or precedent.
More, TCR's general counsel, acknowledged that she was familiar with New Jersey's independent audit committee requirement months before the merger. She sought, however, to form a single audit and compliance committee, similar to that permitted under Nevada law. More pressed her vision of the audit committee "[b]ecause management knows what's going on in the company." She testified that the independent audit committee would have been formed more expeditiously if she was informed in March that the committee could not be comprised of management officials. However, a letter to the Commission drafted in early January 2007 by TCR's outside counsel suggests otherwise. Specifically with regard to the proposed committee containing TCR executives, the letter stated:
Upon speaking with the [Commission], it was [TCR's] understanding that such a make-up might be unacceptable if the "independent" structure necessary for the Audit Committee was lacking[.] [TCR] is in the process of looking into the structure of the Audit Committee and has been talking to Columbia Sussex in an effort to do so and shall keep both the [DGE] and [Commission] informed throughout the process.
As a result of the absence of an approved independent audit committee, TCR's Executive Directors of Internal Audit and Surveillance reported for six months  directly or indirectly  to management (or to no one at all) in clear violation of Commission regulations. When TCR finally submitted a petition to the Commission for a single member independent audit committee, it was promptly approved on June 20, 2007. However, even after the Commission made its position unequivocally clear with regard to the importance of an independent committee structure, and reserved its right to take any and all action in connection with Tropicana's upcoming casino licenses renewal, plenary qualification, or both, Tropicana management continued to ignore Commission regulations by permitting management to attend independent audit committee meetings, purportedly for "informational purposes."
Moreover, two months after Tropicana's independent audit committee approval by the Commission, DGE obtained a copy of a "Legal Representation Agreement," executed on February 19, 2007, between More, on behalf of TCR, and Silver, the sole member of the independent audit committee, on behalf of his law firm, Gordon & Silver, Ltd. In addition to acknowledging Silver's compensation for serving on the independent audit committee, the "Scope of Engagement" section of the agreement provided that TCR "may also engage" Gordon & Silver, Ltd., to represent TCR in "different or additional matters." More testified that she had simply overlooked the potential conflict of interest, stating, "[S]hame on me. It never occurred to me that this sentence would become problematic in terms of evaluating [Silver's] independence." Such circumstances clearly raised a question as to Silver's independence, and formed a basis for DGE's complaint against Tropicana.
Tropicana's claim that they were unable to discern the plain meaning of the word "independent" as it applies to the independent audit committee from the regulation or statute is baseless. A cursory consideration of its plain meaning leads to an unambiguous, self-evident result.
*245 The concept of independence in an audit committee is far from novel. In 1983, the Commission discussed the requirement of an independent director in an unpublished opinion approving a reconstituted board of directors for casino licensee Bally Manufacturing Corp.'s Park Place, Inc. In re Bally Mfg. Corp. and Bally's Park Place, Inc., Commission, final decision, (July 13, 1983). Although an unpublished agency decision may have no precedential value for a court, the body of agency decisional authority is available to the entire regulated community and provides guidance to that community. See In re G & J.K. Enters. v. Div. of Alcoholic Beverage Control, 205 N.J.Super. 77, 85, 500 A.2d 43 (App. Div. 1985) (finding that administrative agencies may use contested case decisions as illustrations of required conduct or prohibited activities), certif. denied, 102 N.J. 397, 508 A.2d 255 (1986). In the 1983 decision, the Commission stated that the director must be neither a present nor former employee of the licensee or any of its affiliated companies and must have no other relationship with the company that would affect his or her exercise of independent judgment. Bally's Park Place, supra, Commission, final decision, 10-11. The Commission utilized this "independent" test again in connection with the 1985 casino license renewal of Resorts International Hotel, Inc., In re Resorts International Hotel, Inc., Commission, final decision, 44 (April 22, 1985), as well as the 1986 license renewal of the Golden Nugget. In re GNOC Corp., 11 N.J.A.R. 433, 449 (Commission 1986). In this case, the Commission once again emphasized the importance of independence when addressing the independent audit committee issue. Accordingly, Tropicana's suggestion that insufficient guidelines existed to define the word "independent" as it applies to independent audit committees and casino licensing is unavailing.
Moreover, the record strongly supports a finding that Tropicana's conduct was purposeful and characterized by a philosophy or desire to do things its way rather than in the manner required by the New Jersey regulatory scheme. The Commission finding that More lacked credibility in her various justifications for Tropicana's regulatory defiance is well-founded. The record demonstrates that More has vast experience in the field of casino regulation, initially as a regulator and later as the legal representative of various parties subject to casino regulatory authorities. She was uniquely qualified to determine the manner in which Tropicana should operate to avoid regulatory transgressions. With her background, a succession of inadvertent regulatory missteps should not have been the norm. Moreover, she, of all Tropicana professionals and executives, should have appreciated the need for an independent audit committee.
The Commission's rejection of Yung's protestations that he had nothing to do with the independent audit committee and no awareness of the issues which culminated in the DGE complaint is also well-founded. Indeed, the record supports the finding that Yung concluded that it was easier to offer an excuse or an apology rather than to acquire information regarding the regulations and the required conforming corporate behavior. This approach is manifest in the failure to promptly institute a conforming independent audit committee and supports the Commission finding that Tropicana did not possess a requisite organizational structure designed to maintain the integrity of its casino facility operations.

IV
Closely related to Tropicana's argument that the standard for composition *246 of an independent audit committee was unknown, it argues that the Commission's order was improper because the Commission utilized previously unarticulated standards in evaluating its license renewal and that these standards were not promulgated in accordance with the Administrative Procedures Act (APA), N.J.S.A. 52:14B-1 to -15, as required by Metromedia, supra, 97 N.J. 313, 478 A.2d 742. Specifically, it argues that the standards for licensure and qualification are "remarkably limited, selective and manifestly inadequate" and that business ability, first class facility, and the independent audit committee requirements are not contained in the regulations.
"The Casino Control Commission is fully subject to the strictures of the APA" for rule-making purposes. Bally Mfg., supra, 85 N.J. at 337, 426 A.2d 1000 (citing N.J.S.A. 5:12-69b; N.J.S.A. 5:12-107a). Here the standards cited and applied by the Commission are clearly enunciated in the statute and duly adopted regulations. The Commission adjudicated the license renewal and the plenary qualification applications according to those standards.
The power of the Legislature to regulate a nonessential and inherently dangerous activity like gaming is almost without limit, as its authority stems from a wholly constitutional expression of concern for public health, safety, morals or general welfare. See In re Boardwalk Regency Corp., 180 N.J.Super. 324, 341, 434 A.2d 1111 (App.Div.1981), aff'd and modified, 90 N.J. 361, 447 A.2d 1335 (1982). The public has a very strong interest in the industry, so it is subject to close regulatory supervision. Id. at 341, 434 A.2d 1111; N.J.S.A. 5:12-1b. The statutory and administrative controls established by the Legislature under the Act are extraordinarily pervasive and intensive. Knight, supra, 86 N.J. at 380-81, 431 A.2d 833. "Where a legislative body establishes basic policy in its enabling statute, it may grant broad authority to an administrative agency to make rules and regulations to effectuate those policies," N.J. Coal. of Health Care Prof'ls, Inc. v. N.J. Dep't of Banking & Ins., 323 N.J.Super. 207, 228, 732 A.2d 1063 (App. Div.), certif. denied, 162 N.J. 485, 744 A.2d 1208 (1999), and the Legislature has done so with the Act, which vests the Commission with broad powers and duties. United Parcel Serv., supra, 255 N.J.Super. at 202, 604 A.2d 960 (citing N.J.S.A. 5:12-63 to -75).
This grant of authority to an administrative agency, like the Commission, should be liberally construed, so it may accomplish its statutory responsibilities. N.J. Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562, 384 A.2d 795 (1978). The agency should be accorded "wide latitude in improvising appropriate procedures to effectuate [its] regulatory jurisdiction," Metromedia, supra, 97 N.J. at 333, 478 A.2d 742, so that it remains flexible and responsive to changing conditions. Coal. for Quality Health Care v. N.J. Dep't of Banking & Ins., 348 N.J.Super. 272, 294, 791 A.2d 1085 (App.Div.), certif. denied, 174 N.J. 194, 803 A.2d 1165 (2002). The flexibility afforded to the Commission enables it to choose between rule making, adjudication, or informal disposition in implementing its statutory duties. Ibid. The procedures of notice and opportunity to comment as described in the APA are only applicable when the Commission's action constitutes rule making. Id. at 295, 791 A.2d 1085; e.g., Adamar of N.J., Inc. v. State, Dep't of Law & Pub. Safety, 250 N.J.Super. 275, 295, 593 A.2d 1237 (App.Div.1991) (finding Commissioner's action was not rule making so the action was not invalidated for failure to meet rule-making procedural requirements); Playboy-Elsinore, supra, 203 *247 N.J.Super. at 477, 497 A.2d 526 (finding condition imposed by Commission to be invalid because it was a de facto rule that should have been dealt with by the agency's rule-making power).
An administrative adjudication or adjudication is defined by the APA as "any and every final determination, decision or order made or rendered in any contested case." N.J.S.A. 52:14B-2(c). A contested case is
a proceeding, including any licensing proceeding, in which the legal rights, duties, obligations, privileges, benefits or other legal relations of specific parties are required by constitutional right or by statute to be determined by an agency by decisions, determinations, or orders, addressed to them or disposing of their interests, after opportunity for an agency hearing. . . .
[N.J.S.A. 52:14B-2(b).]
By definition the implementation or interpretation of a policy or law, like statutory licensure requirements, may qualify as an administrative rule. N.J.S.A. 52:14B-2(e); Metromedia, supra, 97 N.J. at 330, 478 A.2d 742. An agency determination may be considered a "rule" for APA purposes if it "effects a material change in existing law" or "alters the status quo." Metromedia, supra, 97 N.J. at 330, 478 A.2d 742. Sometimes an agency determination may be a hybrid in which it displays characteristics of both rule making and adjudication. Id. at 332, 478 A.2d 742. "If the several relevant features that typify administrative rules and rule-making weigh in favor of action that is quasi-legislative in character, rather than quasi-judicial or adjudicatory, that balance should determine the procedural steps required to validate the ultimate agency action." Ibid.
Tropicana contends that it was given no notice that the Commission might second-guess Tropicana's business judgment or substitute its own business judgment with respect to staffing levels in determining that Tropicana was not running a first class facility and thus, lacked the requisite business ability to qualify for casino license renewal and plenary qualification. Tropicana mischaracterizes the Commission's decision. The Commission did not base its finding that Tropicana lacked business ability on Tropicana AC's first class facility status. The Commission did consider the "massive layoffs" and to some extent the effect of those layoffs as part of its evaluation of Tropicana's business ability. Such consideration was well within the Commission's power as it requires mandatory organization charts and staffing levels.
Early in its opinion, the Commission noted that "the sufficiency of Tropicana's business ability with TCR at the helm has drawn the most attention, as has the suitability of the facility as one that is superior, first class and of exceptional quality." Yet later in the opinion the Commission stated,
Thus far, this opinion has only briefly touched upon the issue of whether the Tropicana casino hotel is a first class facility. Whether that should be an issue in this matter was hotly contested as a procedural issue during the pre-hearing phase of this case. Let there be no mistake or misunderstanding: the previously articulated reasons and their corresponding statutory or regulatory underpinnings set forth earlier in this opinion form a sufficient independent basis upon which to deny the applications for renewal and plenary qualification. The following brief discussion of the first class facility issue is only for purposes of completeness, given the attention that it has drawn.
Consequently, the Commission did not utilize Tropicana AC's status, or lack thereof, as a first class facility as the basis for its decision.
*248 "[S]ufficient business ability and casino experience as to establish the likelihood of creation and maintenance of a successful, efficient casino operation" is specifically required by statute for a casino license applicant. N.J.S.A. 5:12-84d. This statute cannot be read in a vacuum; it must be read in reference to the relevant policy considerations expressed in the Act as a whole. Boardwalk Regency, supra, 180 N.J.Super. at 346, 434 A.2d 1111. The rehabilitation and redevelopment of existing tourist and convention facilities in Atlantic City is a major policy consideration of the Act. N.J.S.A. 5:12-1b(1)-(3). Additionally, the Act states, "It is in the public interest that the institution of licensed casino establishments in New Jersey be strictly regulated . . . to provide a meaningful and permanent contribution to the economic viability of the resort, convention, and tourist industry of New Jersey." N.J.S.A. 5:12-1b(13). Stability and continuity in casino operations is also a policy goal because it inspires confidence in the gaming operations. N.J.S.A. 5:12-1b(14)-(16). Actions that threaten the maintenance of an economically viable and stable operation demonstrate Tropicana's lack of business ability.
Like good character, business ability leaves little doubt about its meaning to people of common intelligence. See Boardwalk Regency, supra, 180 N.J.Super. at 346, 434 A.2d 1111; G & J.K. Enters., supra, 205 N.J.Super. at 83, 500 A.2d 43 (finding "lewdness" and "immoral" as used in a regulation governing the sale of alcoholic beverages sufficiently clear). As pointed out in the opinion, the Commission "has long viewed the meaning of business ability as plain and not in need of explanation." See In re Resorts Int'l Hotel, Inc., 10 N.J.A.R. 244, 252 (Commission 1979) (explaining that the plain meaning of business ability "renders any explanatory remarks unnecessary"). It is entirely logical to expect that major business decisions that affect the viability and success of the casino operation will fall within the scope of one's business ability, and appropriate staffing can make or break a business, particularly one centered around customer service, as pointed out by Preston.
Tropicana was also on notice of this type of evaluation because the Commission, in the past, has evaluated the staffing decisions of casino license petitioners. For example, in In re Elsinore Shore Associates, 11 N.J.A.R. 382, 395 (Commission 1986), the Commission discussed concerns over the impending departure of the members of the management team within the context of the petitioner's business ability. The Commission made a similar evaluation in this case when it discussed the high turnover in key senior management positions since TCR won the bid for Aztar. The Commission noted that these frequent changes in senior management "inevitably raise[s] questions about the ability of TCR . . . to make the necessary choices to assemble and retain a competent team to operate in the highly regulated Atlantic City casino environment."
In GNOC, supra, the Commission found that while it was not its province to determine the staffing levels at the petitioner's Nevada property, the Commission had "no problem requiring that [the Atlantic City property] maintain an adequately and competently staffed surveillance department." 11 N.J.A.R. at 450. Similarly, in this case the staffing levels of Tropicana AC's security and surveillance departments were of specific concern to the Commission throughout Tropicana's operation.
Appropriate staffing changes can also help to prove a applicant's business ability. See In re Claridge Ltd., 10 N.J.A.R. 563, 576 (Commission 1982) (noting positively the substantial changes in personnel over *249 eighteen months). The Commission did recognize TCR's business success at reducing the hotel's check-in wait times.
Therefore, we reject the argument that the standards governing Tropicana's behavior were novel and imposed on it without notice. In addition, the Commission was not required to reduce prior adjudicatory decisions to rules promulgated in accordance with the APA.

V
Tropicana also argues that the Commission findings that it "callously disregarded" the importance of an independent audit committee, that it lacked financial integrity, and that it did not cooperate with regulatory authorities is unsupported by the record. We disagree.
Throughout this opinion, we have touched on some of these topics. In Part III, we discussed Tropicana's response to the institution of a conforming independent audit committee. We discerned a management philosophy that preferred adherence to the manner in which it was accustomed to do things rather than conformance to the requirements of a specific regulatory scheme.
This approach or response to regulation is also manifested in the layoffs instituted at Tropicana AC as soon as TCR acquired the Aztar properties. Yung proceeded not only to terminate significantly more employees than he had suggested would be necessary just two months earlier in remarks during his application for ICA, but also terminated employees without regard to ongoing staffing requirements. Specifically, Yung targeted locksmiths because he did not use locksmiths at his other casino properties. He proposed to eliminate all but one locksmith, who, in turn, would be responsible for key control for the entire casino and hotel complex.
Similarly, in Yung's zeal to conform Tropicana AC's security force to the size of his competitors' security forces, Tropicana AC managers found themselves unable to adhere to mandatory security staffing levels. When the Director of Security advocated adding more staff and resisted further cuts, he was fired. When Tropicana AC's COO informed the Commission of contemplated staff cuts, he was chastised by Yung. When Buro would not implement staff cuts without Commission approval, he was fired. In short, the Commission finding that Yung did not cooperate with regulators was well-supported by the record.
Tropicana also claims that the Commission finding that it lacked the requisite financial stability, integrity and responsibility to be licensed was contrary to DGE's recommendation and "Yung's established record of years of financial business success." Further, Tropicana asserts that the finding was made "solely on the basis of the Commission's unsupported conclusions and misperceptions about testimony concerning two isolated matters that Tropicana had no notice would be considered for purposes of licensure."
N.J.S.A. 5:12-84a requires every applicant for a casino license to affirmatively establish by clear and convincing evidence, "financial stability, integrity and responsibility." Resorts Int'l Hotel, supra, 10 N.J.A.R. at 250.
By its terms, standard encompasses all financial aspects of the [a]pplicant, the holding company and the other qualifiers. in addition to basic solvency or soundness, the standard relates to honesty and forthrightness in business dealings. Further, it includes the care and prudence exercised by the entity or individual in managing, preserving and enhancing *250 the assets entrusted to such entity or individual.
[Ibid.]
Here, the Commission considered the record with regard to Tropicana's financial background and resources before determining that Tropicana failed to prove its financial stability, integrity and responsibility by clear and convincing evidence. In so doing, the regulatory body cited the testimony of Mitchel about a financial transaction in which Yung transferred $300 million from Columbia Sussex to Tropicana. Both companies structured and reported the transaction as a loan, now valued in excess of $500,000,000. Mitchel explained that "[the loan] was done as a vehicle to get the required money that the lender wanted put in as, basically, as equity and it was a vehicle that we chose to use to facilitate the future repayment of that money." Particularly telling for the Commission, however, was Mitchel's response to its question of why the loan was not recorded as a direct investment by Yung, to which the Chief Financial Officer responded, "We would have had to upstream the money to Mr. Yung personally and let him put it down in. Otherwise, if Columbia Sussex had made a direct investment in [Tropicana], it would have triggered some additional regulatory filings." Based upon this testimony, the Commission found that the circumstances demonstrated Tropicana's lack of financial integrity by its apparent attempt to avoid regulatory scrutiny as a holding company.
Tropicana argues that the Commission's finding is "purely speculative, and not even remotely supported by the testimony. . . ." However, such argument is unavailing because the Commission's conclusion is a credibility determination based upon the record, which is entirely within the purview of the regulatory body. In fact, the "clear and convincing" evidentiary standard in casino licensing proceedings requires petitioners to "produce in the mind of the Commissioners a firm belief or conviction as to the truth of the matters sought to be established." Resorts Int'l Hotel, supra, 10 N.J.A.R. at 249. Here, Tropicana sought to establish its financial stability, integrity and responsibility. However, the totality of the circumstances surrounding the financial transaction led the Commission to question its financial integrity. This is all that is required to disqualify Tropicana's application.
Finally, the Commission did not give undue weight to a reported default on Tropicana's loan covenant. The Commission expressly stated that it "is not . . . suggesting that the mere restatement of financial results will always place an applicant in jeopardy under [N.J.S.A. 5:12-84(a)]. Rather, it is the totality of the circumstances in this case that dictates the outcome. . . ."
In short, the findings made by the Commission that Tropicana lacked financial integrity and responsibility, as well as business ability, are amply supported by the record. The massive staff layoffs, the turnover of senior executives accompanied by their replacement with personnel with less extensive casino management experience, the cleanliness crisis experienced in late winter-spring 2007, the regulatory violations directly related to inadequate staffing, and the failure to recognize the immediate need for a conforming independent audit committee and the intransigence in adopting a conforming committee, all attest to the ultimate conclusion that the Tropicana AC license should not have been renewed and that plenary qualification of TCR was properly denied.

VI
We reject the contentions that the Commission erred in rejecting the DGE recommendation *251 for a one-year renewal with conditions, the Commission exceeded its authority by relying on irrelevant and unreliable hearsay, and Commission members were influenced by outside concerns. DGE is responsible for investigating qualifications of each applicant for casino licensure, N.J.S.A. 5:12-76, but the Commission is vested with the authority to independently evaluate each application. Furthermore, hearings conducted by the Commission are not governed by the rules of evidence. N.J.S.A. 5:12-107a(6). It may consider "[a]ny relevant evidence . . . if it is the sort of evidence upon which responsible persons are accustomed to rely in the conduct of serious affairs. . . ." Ibid. Finally, the inquiries about Yung's willingness and ability to work with a unionized workforce was a proper area of concern to evaluate his ability to do business successfully in the Atlantic City market.
Affirmed.
NOTES
[1] Unless otherwise specified, references to Tropicana AC encompass Adamar.
[2] Unless otherwise specified, references to TCR encompass Tropicana Casinos and Resorts, Inc., its subsidiaries, and its predecessors. TCR was previously known as Wimar Tahoe Corp. d/b/a Columbia Entertainment. Tropicana Entertainment Holdings, LLC, Tropicana Entertainment Intermediate Holdings, LLC, and Tropicana Entertainment, LLC, are subsidiaries of TCR.
[3] In addition to the Tropicana AC property, Aztar owned four other gaming properties: two in Nevada including the Tropicana Resort and Casino Las Vegas; one in Evansville, Indiana, and one in Missouri. These properties were also acquired by TCR at the time of the merger. The Missouri property was sold at or near the time of TCR's acquisition of Aztar.
[4] Yung's hotel properties are operated through his privately and wholly owned company, Columbia Sussex Corp (Columbia Sussex). TCR and many of its operations are closely affiliated with Columbia Sussex through a number of management service agreements under which Columbia Sussex and TCR share various administrative services.
[5] ICA may be granted to any person who contracts to transfer any property relating to an ongoing casino operation, if they are required to obtain casino licensure or qualification. N.J.S.A. 5:12-95.12a. The granting of ICA allows the applicant to close or settle the transfer of property without interruption of the casino's operations. Ibid. ICA is not a substitute for licensure or qualification, but it is a temporary measure. During the period of interim authorization the Commission continues to evaluate the applicant and the applicant is "in no way relieved" from its obligations and responsibilities "by the granting of interim authorization." N.J.S.A. 5:12-95.15. Within nine months of the grant or denial of ICA, the Commission "shall hold a hearing and render a decision on the qualification of the applicant." N.J.S.A. 5:12-95.16. It is at this point that the Commission determines whether the applicant should be granted plenary qualification, i.e., full or final casino qualification.
[6] TEL is a holding company for Aztar and consequently Tropicana AC. TEL's parent company is TCR.
[7] In April 2007, Tropicana made a self-report to Bruce Ladd, the Commission's principal inspector, of a grave shift security staffing problem. The letter stated, "Due to security staff personnel either resigning or being let go for cause, the Grave Shift staffing level decreased which in turn required the utilization of mandatory post personnel to perform trolley drops and bill changer pickup, thereby leaving their post." In response nine additional guards were hired for the grave shift.
[8] When Playboy-Elsinore was decided the independent audit committee provision of the administrative code was codified at N.J.A.C. 19:45-1.11(c)(1) and (3). 203 N.J.Super. at 474, 497 A.2d 526. A slightly revised provision is now codified at N.J.A.C. 19:45-1.11(c)2.