**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1125-17T2

IN THE MATTER OF SHIRLEY
SAVAGE, DEPARTMENT OF
HUMAN SERVICES, ANCORA
PSYCHIATRIC HOSPITAL.

_____

Submitted March 25, 2020 – Decided April 28, 2020

Before Judges Koblitz and Gooden Brown.

On appeal from the New Jersey Civil Service Commission, Docket Nos. 2013-2273 and 2013-2274.

Shirley Savage, appellant pro se.

Gurbir S. Grewal, Attorney General, attorney for respondent Department of Human Services, Ancora Psychiatric Hospital (Donna Sue Arons, Assistant Attorney General, of counsel; Elizabeth A. Davies, Deputy Attorney General, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent Civil Service Commission (Dominic Larue Giova, Deputy Attorney General, on the statement in lieu brief).

PER CURIAM

Shirley Savage, a former human services assistant at Ancora Psychiatric Hospital (Ancora), appeals from the September 21, 2017 final agency decision of the Civil Service Commission (Commission), adopting the initial decision of the administrative law judge (ALJ). The ALJ upheld Ancora's termination of Savage's employment for conduct unbecoming a public employee, and other sufficient cause, namely, violating facility-safety policies. We affirm.

We glean these facts from the record. While working at Ancora, Savage was assigned to "one-to-one" continuous monitoring of a single at-risk patient. She was expected to record her observations of the patient during her shift, and she was not permitted to leave her post or sign out of her shift until relieved by another staff member. Pursuant to Ancora's operating procedures, staff working a double shift were to be relieved first.

On January 17, 2013, Savage was served with two preliminary notices of disciplinary action related to two separate incidents during which she left her work assignment without authorization. The first incident occurred on October 13, 2012, and the second occurred on January 11, 2013. Following departmental hearings, Savage was served with two final notices of disciplinary action, sustaining the charges and terminating her employment, effective January 22, 2013. Savage appealed both decisions and the matters were transmitted to the

2

Office of Administrative Law (OAL) as contested cases. See N.J.S.A. 52:14B-1 to -15; N.J.S.A. 52:14F-1 to -13.

During the ensuing OAL hearing, conducted on three non-consecutive days, the matters were consolidated. A total of five staff members testified for Ancora, and a video was introduced in connection with the January 11, 2013 incident. Savage testified on her own behalf as to both incidents.

Remi Etokhana, a human services assistant, testified that on both occasions, Savage left her one-to-one patient before formally transferring her duties to another staff member. Patricia Greer, an aide, James Ronchetti, a nurse, and Adetutu Ogunleye, a charge nurse, corroborated portions of Etokhana's accounts. Ogunleye explained that responsibility for a patient was actually transferred from one staff person to another when the incoming staff person takes the clipboard from the outgoing staff person and both sign off.

Edmund Dillon, Ancora's Section Chief, explained the shift change policies and purpose. He testified that when a staff member is assigned to relieve another, after the two discuss the patient's condition, the incoming staff member "take[s] a clipboard" and "sign[s] off the outgoing [staff member]." The outgoing staff member then "signs the final time," to certify the time the outgoing staff member was relieved, and the incoming staff member "sign[s] at

the bottom of the sheet," indicating that he or she assumed responsibility for the patient at that time. At that point, the outgoing staff member is permitted to leave. Dillon explained that staff members cannot leave one-to-one patients unattended because of the risks posed by these patients. According to Dillon, in one instance, an aggressive patient was left unattended and an employee was stabbed as a result. Dillon also testified that under the shift-change policy, the outgoing staff member will advise the incoming staff member who has worked a double shift because that staff member should be relieved first.

Regarding the October 13, 2012 incident, Ogunleye testified she had assigned Etokhana to relieve a pool nurse who had been working sixteen hours. Etokhana testified that when she arrived at 11:30 p.m. to begin her shift, she observed Savage walk away from her patient notwithstanding the fact that she had informed Savage that she was not assigned to relieve her. Greer confirmed that she observed Savage leave through the exit door of the ward at approximately 11:40 p.m. Ogunleye caught up to Savage and directed her to return to her patient because she had not been relieved of her duties. However, Savage ignored her and walked away. Ogunleye then assigned Greer to take responsibility for Savage's patient and reported the incident to her superior.

Savage denied leaving her patient unattended on October 13, 2012. She explained that she gave Etokhana all the pertinent information about her patient, who was sleeping, handed Etokhana the clipboard, and left. When Etokhana came after her and protested that she was supposed to relieve the pool nurse, who had not been working sixteen hours as Ogunleye claimed, Savage went to the supervisor's office and was told to go back and check on the patient. When she returned, Greer was sitting with the patient. According to Savage, when she left, she was entitled to be relieved, and Etokhana, to whom she had signed off, was now responsible for her patient. She explained that whenever she worked sixteen hours, other staff members were relieved ahead of her "because of favoritism." After she filed written complaints, the favoritism worsened.

Regarding the January 11, 2013 incident, Etokhana testified that although Savage had been working a double shift, she relieved a different staff member, Ronchetti, because Savage refused to remove the dirty linens at her workstation and instead left her patient unattended. Ronchetti confirmed Etokhana's account. Ogunleye testified that when she arrived, Etokhana informed her that Savage had walked away, leaving her one-to-one patient, who was a suicide risk, unattended. The outgoing-shift nurse also told Ogunleye that Savage was not

watching the patient when she made the rounds at 11:30 p.m. Ogunleye assigned Greer to the patient and reported the incident to her superiors.

Greer testified that when she arrived at approximately 11:45 p.m., she observed Savage's clipboard in an empty chair and Savage going out of the exit door in the hallway leading to the supervisor's office. Greer signed off on Savage's patient at 11:53 p.m., indicating that she took responsibility for the patient at that time. She testified that when she signed, no one was present. Greer also authenticated the video dated January 11, 2013, depicting her arriving at 11:44 p.m. and Savage exiting through a rear door between 11:42 p.m. and 11:43 p.m.

Savage again denied leaving the patient unattended. She also denied leaving before 11:45 p.m., when she signed off. She testified that when Etokhana refused to relieve her after she had worked sixteen hours unless she removed her linens, she told Etokhana the patient was fine, he was asleep, there was no incident, and handed her the clipboard. Savage stated she initialed the form and signed off. Savage explained that the relief procedure had nothing to do with linens, and allowing Etokhana to relieve someone else because she refused to remove her linens was a violation of the procedure mandating that sixteen-hour employees had priority for relief. Savage also disputed the video

as accurately depicting the time she left, explaining that the video was from an entirely different date. In support, Savage stated that one of the patients in the video was at Ancora in 2012, not 2013.

In her August 24, 2017 initial decision, the ALJ noted that "the parties offered divergent views of what occurred" during both incidents. After assessing the credibility of the witnesses, the ALJ made the following factual findings:

> Ogunleye . . . testified credibly that on the disputed October 13, 2012[] night, she assigned . . . Etokhana to relieve a pool nurse [who] had been working sixteen hours. As it happened, Ogunleye was in error regarding the pool nurse, who I [find] was at that point starting the first portion of a two-shift night. So, Savage was correct in asserting that under the shift relief policy, she was the person who should have been relieved. The testimony from various parties made clear that there was some fluidity in the assignments, as staff members often took responsibility for the first person they saw. I [find] that Etokhana told Savage she was not assigned to relieve her, but Savage forced the issue by leaving anyway. I [find] that when Savage was told to go back and check the patient, she did so, and that by the time of her arrival, Greer had assumed responsibility for the patient.
>
> With regard to January 11, 2013, I [find] that the fluidity in assignments was even more in play. Etokhana testified credibly both that she had been assigned to relieve [Ronchetti], and that she had a conversation with Savage about relieving her instead due to the fact that Savage had worked sixteen hours.

7

The various comments regarding whether linen did or did not belong on chairs and who was supposed to do what in relation to it remains somewhat confused, except for the obvious fact that some staff members attached more significance to it than others did. . . . Ronchetti testified credibly that Etokhana gave the impression that she would have relieved Savage if Savage had pulled the cover off the chair, but Savage instead left. This harmonizes with Savage's recollection that she recalled him telling her, "Shirley, just help her out by removing the linen. That's all she wants you to do." I [find] that Savage left, that Etokhana did not relieve her, and that no one was assigned to the patient when Greer arrived. I also find credible Ronchetti's testimony that he yelled after Savage that no one had relieved her.

The facility also charged Savage with neglect of duty in relation to signing a sheet up to 11:45 PM when she left at 11:40 PM. As the time on the video (11:43) speaks for itself, the notation made beside the 11:45 time slot on the monitoring schedule must have been made earlier. Therefore, I [find] that the entry was not accurate.

After applying the applicable legal principles, the ALJ concluded that Ancora met its "burden of proving the charges . . . by a preponderance of the competent, relevant, and credible evidence." The ALJ explained

[Savage] is charged with conduct unbecoming and other sufficient cause, namely, violating various administrative policies and orders. Conduct unbecoming is a term that encompasses actions adversely affecting the morale or efficiency of a governmental unit or having a tendency to destroy public respect in the delivery of governmental services

8

. . . .[1] While Savage's frustration with not getting relieved promptly after sixteen hours of work is understandable, it does not negate her duty to ensure that patients who are a threat to their own safety and to others are being watched in accordance with a physician's orders. The time to take the error up with higher level staff was after Savage had been relieved. In October 2012, . . . Etokhana had been directed to relieve someone else. While the fluidity suggested that Etokhana did have some latitude to relieve Savage first, Savage walked away without confirming that this had occurred. There is some truth in Savage's argument that Etokhana is the one that opened the possibility of harm coming to the patient by deciding to go ahead and relieve the other nurse, thereby creating the gap in coverage. But two failures do not create a positive result. Therefore, I [conclude] that savage violated the policy against leaving a one-on-one patient before another has signed onto the responsibility for that patient, and that in doing so she also exhibited conduct unbecoming by opening the patient and others to a risk of harm.

The January 2013 incident is worse because not one but two people—Etokhana and . . . Ronchetti—told Savage she had not been relieved. Further, even if Etokhana's linen-removal demand was unreasonable (which is not clear), it involves a minor effort that would not have significantly delayed Savage's departure. For whatever reason, Savage again placed her right to first relief above the patients' and other staff members' rights to a safe environment. Thus, I [conclude] that this action also amounted to conduct unbecoming and other sufficient cause in the form of violating facility-safety policies.

---

1  See Karins v. Atl. City, 152 N.J. 532, 554-55 (1998).

The facility also charged her with neglect of duty in relation to signing a sheet up to 11:45 p.m. when she left at 11:40 p.m. Since she left before 11:45 p.m., the entry was not accurate, and this action also amounted to conduct unbecoming.

Turning to the penalty, the ALJ explained that in determining the appropriate penalty, "[t]ypically, . . . numerous factors" were considered, "including the nature of the offense, the concept of progressive discipline, and the employee's prior record." Examining her prior record, the ALJ noted that "[i]n her ten-year history at Ancora . . . , Savage has received a three-day suspension in May 2008, a five-day suspension in April 2009, a reprimand in September 2010, a thirty-day suspension in 2010, and a five-day suspension in July 2012." Acknowledging that "progressive discipline [was] not a fixed and immutable rule to be followed without question," the ALJ noted that "[s]ome infractions [were] serious enough on their own to warrant termination." In concluding "that termination [was] the appropriate penalty," the ALJ explained that "although Savage was correct in believing that the facility's policy prescribed relieving people who had worked sixteen hours first, her elevation of that right above the safety of the patients and staff marked a very serious lapse in judgment." The Commission adopted the ALJ's decision and this appeal followed.

On appeal, Savage challenges the sufficiency of the evidence, pointing to the related infractions by her co-workers as justification for her actions; contests the penalty of removal as severe; and claims her rights were violated because evidence and transcripts of the OAL and departmental hearings were withheld, tampered with or omitted from the record. We reject Savage's contentions regarding the sufficiency of the evidence and the appropriateness of the penalty. Because her remaining claims, particularly those related to the withholding of the transcripts of the departmental hearings, are either irrelevant or unsubstantiated, we reject them without further discussion in a written opinion. R. 2:11-3(e)(1)(E). See Appeal of Darcy, 114 N.J. Super. 454, 459 (App. Div. 1971) ("On appeal to the Civil Service Commission from a departmental determination a hearing de novo is held at which all relevant testimony may be introduced," and while "[t]he [d]e novo hearing before the Commission on an administrative appeal is limited to the charges made below, it is not confined to the precise testimony below." (citation omitted)).

Our scope of "review of a final agency decision is limited," In re Carter, 191 N.J. 474, 482 (2007), because the "final determination of an administrative agency . . . is entitled to substantial deference." In re Eastwick Coll. LPN-to RN

11

Bridge Program, 225 N.J. 533, 541 (2016) (citing Univ. Cottage Club of Princeton N.J. Corp. v. N.J. Dep't of Envtl. Prot., 191 N.J. 38, 48 (2007)).

> An appellate court will not reverse an agency's final decision unless the decision is "arbitrary, capricious, or unreasonable," the determination "violate[s] express or implied legislative policies," the agency's action offends the United States Constitution or the State Constitution, or "the findings on which [the decision] was based were not supported by substantial, credible evidence in the record."
>
> [Ibid. (alterations in original) (quoting Univ. Cottage Club, 191 N.J. at 48).]

"The burden of demonstrating that the agency's action was arbitrary, capricious[,] or unreasonable rests upon the [party] challenging the administrative action." In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006). Pertinent to this appeal, when the challenge involves findings of fact, "[g]enerally, an appellate court does not substitute its judgment of the facts for that of an administrative agency." Campbell v. N.J. Racing Comm'n, 169 N.J. 579, 587 (2001). "[T]he choice of accepting or rejecting testimony from witnesses resides with the administrative agency, and so long as that choice is reasonably made it is accorded deference on appeal." Id. at 588. "Although an appellate court is 'in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue,' if substantial evidence supports the

agency's decision, 'a court may not substitute its own judgment for the agency's even though the court might have reached a different result.'"  Carter, 191 N.J. at 483 (citations omitted).

"That deferential standard applies to the review of disciplinary sanctions as well."  In re Herrmann, 192 N.J. 19, 28 (2007).  "A reviewing court should alter a sanction imposed by an administrative agency only 'when necessary to bring the agency's action into conformity with its delegated authority.'"  Ibid. (quoting In re Polk, 90 N.J. 550, 578 (1982)).  Thus, "when reviewing administrative sanctions, 'the test . . . "is whether such punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness."'"  Id. at 28-29 (alteration in original) (quoting Polk, 90 N.J. at 578).

In Herrmann, the Court "acknowledged that discipline based in part on the consideration of past misconduct can be a factor in the determination of the appropriate penalty for present misconduct," id. at 29 (citing West New York v. Bock, 38 N.J. 500, 522 (1962)), and "principles of progressive discipline can support the imposition of a more severe penalty for a public employee who engages in habitual misconduct." Id. at 30.  The Court explained:

> Although progressive discipline is a recognized and accepted principle that has currency in the

[agency's] sensitive task of meting out an appropriate penalty to classified employees in the public sector, that is not to say that incremental discipline is a principle that must be applied in every disciplinary setting. To the contrary, judicial decisions have recognized that progressive discipline is not a necessary consideration when reviewing an agency head's choice of penalty when the misconduct is severe, when it is unbecoming to the employee's position or renders the employee unsuitable for continuation in the position, or when application of the principle would be contrary to the public interest.

Thus, progressive discipline has been bypassed when an employee engages in severe misconduct, especially when the employee's position involves public safety and the misconduct causes risk of harm to persons or property.

[Id. at 33.]

Applying these principles, we are satisfied that the ALJ's factual findings, credibility determinations, and legal conclusions, which were adopted by the Commission under N.J.S.A. 52:14B-10(c), are supported by sufficient, credible evidence in the record as a whole, R. 2:11-3(e)(1)(D), and are neither arbitrary, capricious, nor unreasonable. We are equally satisfied that, given the circumstances, the penalty of termination was not so disproportionate to the infraction as to shock our sense of fairness.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

14

A-1125-17T2