**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1587-23

IN THE MATTER OF
MICHELLE SAMPSON, UPPER
TOWNSHIP, DEPARTMENT
OF RECREATION AND PUBLIC
HEALTH.

_____

Submitted May 6, 2025 – Decided May 30, 2025

Before Judges Smith and Chase.

On appeal from the New Jersey Civil Service Commission, Docket No. 2023-281.

Jacobs & Barbone, PA, attorneys for appellant Michelle Sampson (Louis M. Barbone, on the brief).

Gorman, D'Anella and Morlok, LLC, attorneys for respondent Upper Township, Department of Recreation and Public Health (Alicia D'Anella, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent New Jersey Civil Service Commission (Bernadette Dronson, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Petitioner Michelle Sampson appeals from the Civil Service Commission's ("Commission") December 20, 2023 final agency decision terminating her employment as an Emergency Medical Technician ("EMT") with Upper Township (the "Township"). We affirm.

I.

Petitioner started as a part-time EMT with the Township in 2003. She became a full-time EMT in 2006, was promoted to the position of Senior EMT in 2016, and was ultimately appointed as Chief EMT in January of 2020 after serving in an acting capacity since December 1, 2019.

J.H.[1] has been employed as a part-time EMT with the Township since 2007. Petitioner and J.H. were engaged in a romantic relationship that began and ended in 2007 while both were co-employees. In 2016, petitioner and J.H., both married to others, rekindled their romantic relationship and began an extra-marital affair.

In 2016, the Township enacted a Township Employee Dating Policy ("Dating Policy" or "the policy"), which set forth an employee's obligation to report a romantic or intimate relationship to their supervisor or the Township

---

[1] We use initials to protect the privacy of the parties. R. 1:38-3(d)(10).

A-1587-23

Administrator. The Dating Policy recognized that intimate relationships "can be a problem in the workplace. They may result in favoritism, discrimination, unfair treatment, friction among co-workers, or the perception that they generate such problems." The Dating Policy further required that "[i]f such a relationship exists or develops, both parties involved shall report the fact . . . ." Neither party disclosed the relationship to the Township.[2]

Under the policy, a supervisor/subordinate status is defined without regard for official title or classification but rather encompasses "a situation where one employee makes or has the authority to make decisions to take actions concerning another employee's compensation, promotion, demotion, discipline, daily tasks, or any other terms, conditions or privileges of employment with the municipality." The policy explicitly states that a supervisor/subordinate relationship exists where one employee is making decisions that affect another irrespective of job title or civil service classification. In addition to requiring disclosure of a relationship, the Dating Policy put employees on notice that violations of the policy would result in disciplinary action, "up to and including discharge."

---

[2] J.H.'s alleged violation of the Dating Policy is not the subject of this appeal.

In October 2020, the Township announced its intent to hire two full-time EMTs. J.H.'s wife, M.H., who was a part-time EMT, applied for the position and was interviewed by a panel of six, including petitioner, but ultimately did not get the job. Several months later, M.H. filed a complaint with the Township alleging she did not get the EMT job because petitioner failed to recommend her for a full-time position because of petitioner's affair with J.H.[3] J.H. also filed a complaint with the Township against petitioner.

As a result of the complaints, the Township conducted an investigation. The investigation began with two interviews of J.H. J.H. disclosed that in 2016 he and petitioner began having a "sexual/physical" relationship while she was a Senior EMT and involved in creating the work schedule for all of the EMTs. During his first interview J.H. admitted that the "sexual/physical" relationship occurred at the EMS building and other places on Township property. J.H. further admitted that he and petitioner not only engaged in sexual intercourse numerous times at the Township EMS building, but that they were on duty at the time. Specifically, J.H. claimed that petitioner would schedule them to work the same shift, or schedule their spouses to work the same shift, in order to provide J.H. and petitioner the opportunity to be alone together. According to

---

[3] The Township settled this complaint with M.H. for $150,000.

J.H., they no longer engaged in sexual intercourse after petitioner became the Chief EMT, however, J.H. admitted that they still engaged in other sexual acts, such as kissing and touching.

When petitioner was interviewed, she admitted being in a relationship with J.H. in 2007, and then again beginning in 2016. She contended that the relationship ended before she was promoted to Chief EMT. When asked about the allegations that she and J.H. had sexual relations inside the confines of the EMS building from time to time, she did not deny it, initially stating instead "I – I'd like to hear what he has" and later acknowledging "it could have happened." She also admitted that "it could have happened" when asked whether she manipulated the schedule as a Senior EMT to ensure she and J.H. could have time alone. Petitioner admitted, under oath, that she was aware of the Dating Policy and that she violated it by not reporting her affair with J.H. to the Township. She also stated that she did not report her relationship to the Township, because she was trying to hide her extramarital affair.

Despite petitioner's insistence that their relationship ended before she became chief, both J.H. and petitioner provided the Township with text messages exchanged between them that evidenced an intimate relationship between them well into 2020. For instance: a May 12, 2020, text in which

5

petitioner asks J.H. if he can Facetime on her work phone and J.H. responds that the work phone makes him nervous; a May 24, 2020, text in which J.H. demonstrates the continuation of their relationship when petitioner served as Chief EMT, by saying "Guess you're really busy today. Went from talking about kissing me to nothing." Petitioner replies, "Ur sending that on my work cell."; and multiple texts on August 7, 2020, in which petitioner tracks J.H.'s family's flight as J.H. waits for them at the airport and when asked whether he was still waiting, he responded "Yes babe."

The investigation also revealed that in 2020, prior to the disclosure of the affair, the Township began the process of hiring two full-time EMTs. Petitioner sat on the panel of interviewers who questioned the applicants. Petitioner, as Chief EMT at the time, recommended two other candidates besides M.H. for the full-time positions. Consistent with the recommendation, the two other candidates were hired by the Township Committee. Petitioner admitted that she failed to disclose that she had an affair with one of the applicant's spouses because their affair remained a secret that "no one knew."

At the end of the investigation, the Township issued a Preliminary Notice of Disciplinary Action against petitioner, alleging multiple violations of N.J.A.C. 4A:2-2.3(a) for violating the Dating Policy. These included:

incompetency; inability to perform her duty; conduct unbecoming a public employee; neglect of duty; and misuse of public property. The Township then filed an amended Notice of Disciplinary Action immediately suspending petitioner with intent to terminate pursuant to N.J.A.C. 4A:2-2.5(a)(1).

In July 2022, a Hearing Officer conducted a disciplinary hearing and found that petitioner violated the Dating Policy and Civil Service Regulations. The Township then issued a Final Notice of Disciplinary Action ("FNDA") sustaining all the charges and terminating her employment.

Petitioner filed an appeal with the Commission and the case was transmitted to the Office of Administrative Law for a de novo trial. On January 11, 2023, the trial commenced before an Administrative Law Judge ("ALJ") and the Township presented Rhonda Sharpe, the Township Human Resource Director as a witness.

On January 31, 2023, the following relevant facts were stipulated to before the ALJ:

> . . .
>
> 2. The Preliminary Notice of Disciplinary Action was based on two complaints: 1) one received on January 12, 2021 from EMT [M.H.] and 2) a second received by the Township January 19, 2021 from EMT, [J.H.]. The Township also interviewed [M.H.] on two occasions: January 19, 2021 and February 1, 2021.

. . .

5.   [Petitioner] acknowledges that [J.H.] filed an employee complaint but denies the accuracy and veracity of that complaint.

. . .

7.   [Petitioner] filed the instant appeal of her termination with the [Commission]. While she admits violating the Township's employee dating policy, she appeals the Hearing Officer's determination as to the other violations and the discipline imposed.

8.   The parties acknowledge that the Township has an employee dating policy which is contained in the Township's Employee Manual and will be one of the Township's exhibits.

9.   On February 3, 2021, [petitioner] provided a recorded statement to the Township wherein she admits that she violated the Township's employee dating policy by virtue of her failure to report the existence of her former relationship with a coemployee [J.H.].

10.   At the time petitioner was served with the Preliminary Notice on March 29, 2021, she was a senior emergency medical technician employed by the Township since initially hired in June of 2006 as an emergency medical technician. Petitioner was thereafter promoted to the position of senior emergency medical technician and held that position until December of 2019. She was then appointed as the Chief EMT in Upper Township on November 25, 2019. The Township then by resolution appointed her Chief January 1, 2021. Petitioner was then terminated as Chief and demoted back to the position of senior EMT by way of resolution on February 22, 2021.

8

11. Petitioner has no record of any disciplinary infraction with the Township.

On the second day of trial, the petitioner testified. The Township then recalled Sharpe for rebuttal testimony.

On November 13, 2023, the ALJ filed an initial decision concluding that an affair had occurred between petitioner and her colleague, that petitioner was aware of the Township's Dating Policy, and that she failed to advise the Township or her superiors of the affair. The ALJ concluded that the Township met its burden of proof by establishing all the violations listed in the FNDA, and recommended removal.

After considering petitioner's exceptions and the Township's reply, the Commission issued its final decision on December 20, 2023, in which it adopted the findings of fact and conclusions of law set forth by the ALJ.

II.

"[A] 'strong presumption of reasonableness attaches to the actions of the administrative agencies.'" In re Carroll, 339 N.J. Super. 429, 437 (App. Div. 2001) (quoting In re Vey, 272 N.J. Super. 199, 205 (App. Div. 1993)). The scope of our review of a final decision of an administrative agency is limited and we will not reverse such a decision unless it is "arbitrary, capricious, or unreasonable, or not supported by substantial credible evidence in the record as

9                                                                          A-1587-23

a whole." In re Stallworth, 208 N.J. 182, 194 (2011) (citing Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980)). When making that determination, we consider:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Ibid. (citing In re Carter, 191 N.J. 474, 482-83 (2007)).]

Decisions "made by an administrative agency entrusted to apply and enforce a statutory scheme" are reviewed "under an enhanced deferential standard." East Bay Drywall, LLC v. Dep't of Lab. & Workforce Dev., 251 N.J. 477, 493 (2022). "[G]enerally, when construing language of a statutory scheme, deference is given to the interpretation of statutory language by the agency charged with the expertise and responsibility to administer the scheme." Acoli v. N.J. State Parole Bd., 224 N.J. 213, 229 (2016). "This deference comes from the understanding that a state agency brings experience and specialized knowledge to its task of administering and regulating a legislative enactment within its field of expertise." In re Election Law Enf't Comm'n Advisory Op.

No. 01-2008, 201 N.J. 254, 262 (2010). Thus, a court must affirm the decision if the evidence supports it, even if the court may question its wisdom or would have reached a different result. Campbell v. N.J. Racing Comm'n, 169 N.J. 579, 587 (2001). A reviewing court is not, however, bound by an agency's interpretation of a statute or its determination of a strictly legal issue outside its charge. Allstars Auto. Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 158 (2018).

III.

A.

First, petitioner contends the decision was arbitrary and capricious because the Commission only adopted the findings of fact and conclusions as found in the initial decision and made no independent finding of fact. Further petitioner claims there was a dispute on the threshold issue of whether she and J.H. were involved in a "supervisor/subordinate dating relationship" and the Dating Policy was never determined to be applicable to the admitted extramarital affair. We are not persuaded by those arguments.

Petitioner's own testimony, admissions and stipulations of fact form the basis that she violated the Dating Policy. Notably, petitioner admitted that the allegation that she purposefully scheduled herself and J.H. to work during the

11

same shift "could have happened." The record also shows that petitioner initially avoided responding to allegations that she and J.H. engaged in sexual activity on Township Property, stating "I – I'd like to hear what he has." Petitioner ultimately admitted that the allegations of having sexual relations with J.H. in the EMS building "could have happened."

It has long been established that courts are justified in relying on and bound to give legal effect to facts stipulated to by the parties. See R.E. Dudley Co. v. Aron, 106 N.J.L. 100, 103 (E. & A. 1929) (holding that stipulated facts are evidentiary and entitled to be given legal effect). This is set forth explicitly in the Uniform Administrative Procedure Rules, which provide "[t]he parties may by stipulation agree upon the facts or any portion thereof involved in any controversy. Such a stipulation shall be regarded as evidence and shall preclude the parties from thereafter challenging the facts agreed upon." N.J.A.C. 1:1-15.11. Here, there was also independent evidence, including J.H.'s statements and text messages between petitioner and J.H., that also corroborated that petitioner violated the Dating Policy. These facts support the Commission's final determination was not arbitrary, capricious, or unreasonable.

Moreover, the plain language of the Dating Policy supports the Commission's decision. The Dating Policy broadly defines

12

supervisor/subordinate relationship to include any relationship where one person has the authority to make decision about nearly any aspect of the other person's employment. As Senior EMT, petitioner was able to "take the lead" over other EMTs while administering emergency treatment. Directing the work of others in furtherance of ensuring the quality of care a patient receives has been recognized as a supervisory function requiring supervisory judgment and indicating supervisory authority. See NLRB v. Attleboro Assoc. Ltd., 176 F.3d 154, 169 (3d. Cir. 1999).

Petitioner's violation of the Dating Policy is also evidenced by her participation in employment decisions regarding M.H. In her capacity as Chief, petitioner passed over M.H. and recommended two other candidates for hire. This resulted in liability to the Township. Petitioner should have disclosed the conflict or abstained from taking part in the hiring process once M.H. was a candidate. As such, the Agency's final decision was not arbitrary and capricious.

B.

Petitioner next argues that the Commission erred as a matter of law in determining that the evidence against petitioner was admissible under the residuum rule. Specifically, she alleges that the statements of J.H. should not

13

have been admissible because they were double hearsay. That argument lacks merit.

In contested administrative proceedings, "[t]he parties shall not be bound by rules of evidence whether statutory, common law, or adopted formally by the Rules of Court." N.J.S.A. 52:14B–10(a)(1). With certain exceptions, "[a]ll relevant evidence is admissible . . . ." N.J.A.C. 1:1–15.1(c).

> Subject to the judge's discretion to exclude evidence under N.J.A.C. 1:1–15.1(c) or a valid claim of privilege, hearsay evidence shall be admissible in the trial of contested cases. Hearsay evidence which is admitted shall be accorded whatever weight the judge deems appropriate taking into account the nature, character and scope of the evidence, the circumstances of its creation and production, and, generally, its reliability.
>
> [N.J.A.C. 1:1–15.5(a).]

However, the "residuum rule" provides: "[n]otwithstanding the admissibility of hearsay evidence, some legally competent evidence must exist to support each ultimate finding of fact to an extent sufficient to provide assurances of reliability and to avoid the fact or appearance of arbitrariness." N.J.A.C. 1:1–15.5(b).

In Weston v. State, the Court explained "in the final analysis[,] for a court to sustain an administrative decision[] which affects the substantial rights of a party, there must be a residuum of legal and competent evidence in the record

14

to support it." 60 N.J. 36, 51 (1972) (citing Gillian v. Int'l Paper Co., 24 N.J. 230, 236 (1957)). "The risks of relatively free use of hearsay and other forms of evidence not sanctioned by the Rules of Evidence are mitigated by a correlative standard requiring the existence of some legally competent evidence as the foundation of every adjudicative determination made by an administrative agency." DeBartolomeis v. Bd. of Rev., 341 N.J. Super. 80, 84 (App. Div. 2001).

Petitioner conflates the admissibility of hearsay under the residuum rule with its probative value. Sharpe's testimony recalling her interview of J.H. was admissible as hearsay so long as there was a residuum of evidence to confirm it. In re Dubov, 410 N.J. Super. 190, 202 (App. Div. 2009). Petitioner overlooks the most compelling evidence presented to corroborate J.H.'s testimony: her own admissions. Her text messages and statements made during the Township's investigation are competent legal evidence, which make Sharpe's testimony admissible under the residuum rule.

Contrary to petitioner's arguments, the text messages exchanged between her and J.H., which have never been disputed, support the conclusion that the intimate relationship continued, to some extent, into 2020 when she was chief. Far from relying strictly on hearsay, the ALJ clearly articulated that the texts

A-1587-23

formed the basis for his finding: "[Petitioner] and [J.H.] engaged in exchange of text and other messages up to and including August 18, 2020, the substance of which is indicative of a continuing relationship between the two exceeding that of a supervisor/employee relationship." The text messages, when combined with petitioner's admission that she and J.H. had an extramarital affair for several years, reveal ongoing intimacy, however undefined, between the two. Accordingly, the finding that a relationship "exceeding that of a supervisor/employee relationship" persisted up to August of 2020 is not based only on J.H.'s recorded interview, but rather the content of the messages exchanged between petitioner and J.H.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-1587-23